## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Joyce Vallone and Erasmus Ikogor, individually and on behalf of all others similarly situated, | **Court File No. 19-cv-01532 PAM-DTS** |
| Plaintiffs, | **DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION AND THE ISSUANCE OF COURT-SUPERVISED NOTICE** |
| vs. | |
| The CJS Solutions Group, LLC d/b/a The HCI Group, | |
| Defendant. | |

Jacqueline E. Kalk (#0388459)
jkalk@littler.com
Claire B. Deason (#0390570)
cdeason@littler.com
Corey J. Christensen (#0398314)
cchristensen@littler.com
**LITTLER MENDELSON, P.C**.
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402.2136
Telephone: 612.630.1000

**ATTORNEYS FOR DEFENDANT**

## TABLE OF CONTENTS

PAGE

INTRODUCTION ........................................................................................... 1

FACTUAL BACKGROUND ........................................................................... 3

I.      HCI IMPLEMENTS MEDICAL RECORDKEEPING SOFTWARE ................. 3

II.     HCI EMPLOYS A UNIQUE GROUP OF "ATES" FOR EACH GO LIVE ......... 5

         A.     Each "Go-Live" Project is a Stand-Alone Event ......................................... 6

         B.     For Each Project, ATEs' Employment Begins at Orientation .................... 6

         C.     ATE Travel From Hotel to Worksite is Disparate ..................................... 7

         D.     ATEs' Employment Ends When They are "Cut" or "Tapered" From the Project ................................................................................................ 8

         E.     Lead ATEs Have Different Job Duties than Non-Lead ATEs .................... 9

III.    VALLONE AND IKOGOR WORKED ON THE MAYO CLINIC "GO-LIVE" EVENT IN ROCHESTER, MINNESOTA ............................................. 10

         A.     Vallone Performed No Work While Commuting to or from the Mayo Clinic .............................................................................................. 10

ARGUMENT .................................................................................................. 13

I.      THE COURT'S PERSONAL JURISDICTION OVER HCI IS LIMITED TO CLAIMS WITH A CONNECTION TO MINNESOTA ................................ 13

II.     HCI EMPLOYEES WHO AGREED TO INDIVIDUALLY ARBITRATE THEIR CLAIMS ARE NOT PROPERLY INCLUDED IN A PUTATIVE COLLECTIVE ACTION. ................................................................................. 18

         A.     HCI Employees Execute Arbitration Agreements as a Matter of Course ........................................................................................................ 19

         B.     Notice Should Not Issue To Arbitration Agreement Signatories .............. 20

i

**TABLE OF CONTENTS**
(CONTINUED)

PAGE

III. PLAINTIFFS' HAVE NOT MET THEIR BURDEN TO SHOW A
SIMILARLY-SITUATED GROUP FIT FOR COLLECTIVE
TREATMENT ................................................................................. 22

    A.    Each Putative Plaintiff Has a Unique Claim for Travel Time ................. 23

        1.    Workers Not Employed at the Time of Travel Have No
Viable Claim, and Putative Plaintiffs are Disparate With
Respect to the Time of Employment .............................................. 24

        2.    Commuting Time is Not Compensable, and Putative Plaintiffs
Have Disparate Experiences With Commuting Time .................... 26

        3.    Travel Away from Home During "Normal Working Hours" is
Generally Compensable, but the Putative Class is Disparate
With Respect to Travel During "Normal Working Hours." ........... 27

        4.    The Named Plaintiffs' Claims Illustrate the Disparities Within
Their Proposed Collective .............................................................. 28

        5.    Plaintiffs Submitted No Evidence Regarding Any Group of
HCI Employees Other Than ATEs ................................................. 30

IV. PLAINTIFFS' PROPOSED NOTICE PROCESS IS DUPLICATIVE,
OVERLY INTRUSIVE, AND LIKELY TO CREATE CONFUSION ............... 31

    A.    A Single Notice by Mail is Reasonable ..................................................... 32

    B.    A Notice Period of 60 Days is Appropriate ............................................. 33

    C.    The Court Should Not Issue A Reminder Postcard.................................. 33

    D.    Plaintiffs' Request for Contact Information is Overbroad ........................ 34

    E.    The Court Should Designate An Administrator To Receive Names
And Contact Information............................................................................ 35

    F.    Plaintiffs' Proposed Notice and Consent Documents are Improper ......... 36

        1.    Plaintiffs' Proposed Notice is Misleading....................................... 36

## TABLE OF CONTENTS
### (CONTINUED)

PAGE

      2.     Plaintiffs' Proposed Notice is Not Neutral......................................37

      3.     Plaintiffs' Proposed Consent Form Is Improper ............................38

V.     PLAINTIFFS ARE NOT ENTITLED TO EQUITABLE TOLLING..................39

CONCLUSION ............................................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bah v. Shoe Mania, Inc.*,
   No. 08CIV.9380LTSAJP, 2009 WL 1357223 (S.D.N.Y. May 13, 2009)...................36

*Belcher v. Shoney's, Inc.*,
   927 F. Supp. 249 (M.D. Tenn. 1996)...........................................................................37

*Bracamontes v. Bimbo Bakeries U.S.A., Inc.*,
   2017 WL 4621276 (D. Colo. Aug. 3, 2017) ...............................................................21

*Bramble v. Wal-Mart Stores*,
   No. 09-4932, 2011 WL 1389510 (E.D. Pa. Apr. 12, 2011).........................................23

*Bristol-Myers Squibb Co. v. Superior Court of Cal.*,
   137 S. Ct. 1773 (2017) .............................................................................. 13, 14, 15, 16

*Chavira v. OS Rest. Servs., LLC*,
   No. 18-CV-10029-ADB, 2019 WL 4769101 (D. Mass. Sept. 30, 2019) ........ 15, 16, 18

*Costello v. Kohl's Illinois, Inc.*,
   2014 U.S. Dist. LEXIS 124376 (S.D.N.Y. Sep. 4, 2014)............................................31

*Dalton v. Hennepin Home Health Care, Inc.*,
   2016 U.S. LEXIS 108765 (D. Minn. Aug. 16, 2016).................................................26

*Delgado v. United States*,
   No. 97–1(4), 2002 WL 1763997 (D. Minn. July 26, 2002).........................................40

*Dietrich v. C.H. Robinson Worldwide, Inc.*,
   18-C-4871, 2019 U.S. Dist. LEXIS 48555 (N.D. Ill. Mar. 20, 2019) ........................21

*E.E.O.C. v. Woodmen of World Life Ins. Soc.*,
   479 F.3d 561 (8th Cir. 2007) .....................................................................................22

*Epic Systems Corp. v. Lewis*,
   584 U.S. ___, 138 S. Ct. 1612 (2018).........................................................................22

*Fa Ting Wang v. Empire State Auto Corp.*,
   No. 14–cv–1491 (WFK), 2015 WL 4603117 (E.D.N.Y. July 29, 2015)....................33

*Facebook, Inc. v. Biggers*,
   No. 19-8011, slip op. (7th Cir. May 3, 2019) .............................................................. 21

*Gamble v. Minnesota State-Operated Servs.*,
   No. 016CV02720JRTKMM, 2018 WL 7254598 (D. Minn. Nov. 14,
   2018), report and recommendation adopted, No. CV 16-2720
   (JRT/KMM), 2019 WL 313034 (D. Minn. Jan. 24, 2019) ........................................... 40

*Garcia v. Elite Labor Serv., Ltd.*,
   No. 95 C 2341, 1996 WL 33500122 (N.D. Ill. July 11, 1996) ................................... 37

*Garcia v. TWC Admin., LLC*,
   No. SA:14-CV-985-DAE, 2015 WL 1737932 (W.D. Tex. Apr. 16,
   2015) .................................................................................................................. 32, 33

*Gjurovich v. Emmanuel's Marketplace, Inc.*,
   282 F. Supp. 2d 101 (S.D.N.Y. 2003) ....................................................................... 37

*Gonzalez v. TZ Ins. Sols.*,
   LLC, No. 8:13-CV-2098-T-33EAJ, 2014 WL 1248154 (M.D. Fla. Mar.
   26, 2014) .................................................................................................................. 37

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011) ................................................................................................. 14

*Gordon v. Kaleida Health*,
   No. 08-CV-378S, 2009 WL 3334784 (W.D.N.Y. Oct. 14, 2009) .............................. 32

*Griffin v. S & B Engineers & Constructors, Ltd.*,
   507 F. App'x 377 (5th Cir. 2013) .............................................................................. 29

*Gulf Oil Co. v. Bernard*,
   452 U.S. 89 (1981) ................................................................................................... 35

*Hoffman-LaRoche, Inc. v. Sperling*,
   493 U.S. 165 (1989) ................................................................................. 3, 18, 22, 37

*Holaway v. Stratasys, Inc.*,
   No. CV 12-998, 2012 WL 12895690 (D. Minn. Oct. 30, 2012) .................... 33, 34, 40

*Holt v. Rite Aid Corp.*,
   333 F. Supp. 2d 1265 (M.D. Ala. 2004) .................................................................... 27

*Horne v. United Servs. Auto. Ass'n*,
   279 F. Supp. 2d 1231 (M.D. Ala. 2003) .................................................................... 23

*Hudgins v. Total Quality Logistics, LLC*,
  No. 16 C 7331, 2017 WL 514191 (N.D. Ill. Feb. 8, 2017)..........................................21

*Integrity Staffing Sols. v. Busk*,
  135 S. Ct. 513 (2014) ..................................................................................................26

*Irwin v. Dep't of Veterans Affairs*,
  498 U.S. 89 (1990)......................................................................................................39

*Johnson v. Academy Mortg. Co.*,
  Case No. 2:12-cv-276-TS, 2012 WL 3886098 (D. Utah Sept. 6, 2012).....................39

*In re JPMorgan Chase & Co.*,
  916 F.3d 494 (5th Cir. 2019) .............................................................................. 20, 21

*Knispel v. Chrysler Grp.*
  LLC, No. 11-11886, 2012 WL 553722 (E.D. Mich. Feb. 21, 2012) ..........................36

*Kuebel v. Black & Decker Inc.*,
  2009 U.S. Dist. LEXIS 43846 (W.D.N.Y. May 18, 2009).........................................27

*Maclin v. Reliable Reports of Tex., Inc.*,
  314 F. Supp. 3d 845 (N.D. Ohio 2018)................................................................ 15, 16

*Martinez v. Cargill Meat Sols.*,
  265 F.R.D. 490 (D. Neb. 2009).................................................................................34

*Martinez v. Rial De Minas, Inc.*,
  No. 16-CV-01947-RM-KLM, 2017 WL 9509950 (D. Colo. Oct. 12,
  2017) .........................................................................................................................32

*McLaurin v. Prestage Foods, Inc.*,
  271 F.R.D. 465 (E.D.N.C. 2010) ..............................................................................23

*Morisky v. Public Service Elec. and Gas Co.*,
  111 F. Supp. 2d 493, 498 (D.N.J. 2000). ..................................................................27

*Parker v. Rowland Express, Inc.*
  492 F. Supp. 2d 1159, 1164 (D. Minn. 2007)...........................................................23

*Pettenato v. Beacon Health Options, Inc.*,
  No. 19CV1646JPOBCM, 2019 WL 5587335 (S.D.N.Y. Oct. 25, 2019).............. 15, 17

*In re RBC Dain Rauscher Overtime Litig.*,
  703 F. Supp. 2d 910 (D. Minn. 2010).................................................................. 35, 40

*Reich v. Homier Distributing Co., Inc.*,
    362 F. Supp. 2d 1009 (N.D. Ind. 2005) ................................................................... 27

*Robinson v. Empire Equity Grp., Inc.*,
    No. CIV. WDQ-09-1603, 2009 WL 4018560 (D. Md. Nov. 18, 2009) ..................... 35

*Romero v. Mountaire Farms, Inc.*,
    796 F.Supp.2d 700 (E.D.N.C. 2011)........................................................................ 22

*Roy v. FedEx Ground Package Sys., Inc.*,
    353 F. Supp. 3d 43 (D. Mass. 2018) ........................................................................ 15

*Sanchez v. Ocwen Loan Servicing, LLC*,
    No. 6:06CV1811 ORL28DAB, 2007 WL 809666 (M.D. Fla. Mar. 15,
    2007) ........................................................................................................................ 37

*Sanchez v. Q'Max*,
    No. 17-cv-01382-CMA-KLM, 2018 WL 107113 (D. Colo. Feb. 27,
    2018) ........................................................................................................................ 20

*Shajan v. Barolo, Ltd.*,
    No. 10 CIV. 1385 (CM), 2010 WL 2218095 (S.D.N.Y. June 2, 2010)..................... 38

*Simmons v. Valspar Corp.*
    No. CIV. 10-3026 RHK/SER, 2011 WL 1363988, at *5 (D. Minn. Apr.
    11, 2011) .................................................................................................................. 33

*Standard Fire Ins. Co. v. Knowles*,
    568 U.S. 588 (2013) ................................................................................................. 17

*Syed v. M-I, L.L.C.*,
    No. 1:12-CV-1718 AWI MJS, 2014 WL 6685966 (E.D. Cal. Nov. 26,
    2014) ........................................................................................................................ 35

*Szewczyk v. United Parcel Serv., Inc.*,
    No. CV 19-1109, 2019 WL 5423036 (E.D. Pa. Oct. 22, 2019).................................. 15

*Taylor v. Autozone, Inc.*,
    No. CV-10-8125-PCT-FJM, 2011 WL 2038514 (D. Ariz. May 24,
    2011) ........................................................................................................................ 34

*Turner v. Utiliquest, LLC*,
    3:18-cv-00294 (M.D. Tenn. July 16, 2019) ............................................................... 15

*Vallone, et al. v. Santa Rosa Consulting Inc.*,
No. 19-cv-11779 (E.D. Mich. June 14, 2019) ........................................................ 10

*In re Wells Fargo Wage & Hour Empl. Practices Litig.*,
2013 WL 2180014 ..................................................................................... 34, 37

**Statutes**

28 U.S.C. § 216(b) ................................................................................................. 22

29 U.S.C. § 203(e)(1)-(g) ...................................................................................... 25

29 U.S.C. § 254 ..................................................................................................... 26

29 U.S.C. § 256 ..................................................................................................... 39

Minn. Stat. § 543.19 ............................................................................................. 16

**Other Authorities**

29 C.F.R. §§ 785.7-.11 ......................................................................................... 26

29 C.F.R. § 785.35 ........................................................................................... 26, 29

Fed. R. Civ. P. 54(d) ............................................................................................. 36

## <u>INTRODUCTION</u>

Named Plaintiffs Vallone and Ikogor ask the Court to conditionally certify a collective of thousands of hourly paid, non-exempt employees to test the merits of their travel-time claim. But Plaintiffs' Motion is fatally flawed: Vallone and Ikogor are not similarly situated to *one another* with respect to travel time, much less to the collective they seek to represent, many of whom cannot establish the personal jurisdiction required to pursue their claims, and many who have agreed with HCI to arbitrate those claims. In fact, Ikogor himself does not fit into the putative collective. If the Court grants Plaintiffs' Motion, the collective will consist of:

- Workers who were arguably employed by HCI when they traveled to and from the worksites, and many who were not;

- Workers like Ikogor who, for some of his work, received instructions to complete work-related tasks during the travel time between hotel and job site and, accordingly, seek compensation for that time;

- Workers like Vallone who never performed any work-related tasks during travel time between hotel and job site and, like Vallone, do *not* seek compensation for that time;

- Workers who traveled to and from the worksite in their personal vehicle, with family or friends as guests, and utilized the time spent traveling for personal leisure;

- Individuals who worked for multiple companies – some traveling directly from one company's worksite to another – who, like Vallone, considered themselves to be "independent contractors" and not employees of HCI, or any other technology company;

- Individuals who, like Ikogor as to one particular job assignment, traveled directly from one HCI job site to another;

- Individuals who traveled to the HCI job site from home, from another company's worksite, or from any other personal commitments;

1

- Individuals who – like Vallone and Ikogor – did not travel during their regular HCI work hours;

- Individuals who traveled during the same hours they were assigned to work;

- Individuals who – like Ikogor – were designated as "Lead" workers and allegedly performed work-related tasks during unpaid travel time;

- Individuals who – like Vallone – were not assigned to be "Lead" and never performed work-related tasks while traveling; and

- Workers whom HCI never asked to attend the rescheduled orientation session for which Vallone and Ikogor seek compensation.

No common policy or plan binds these groups together – and Plaintiffs certainly have not identified one. Vallone and Ikogor lack personal knowledge regarding HCI's travel compensation policy outside of their own limited experiences, and even their testimony reveals material distinctions in the method and potential compensability of time spent traveling. Despite relying on this inadequate evidence, Plaintiffs boldly claim that they need not prove anything to persuade the Court to issue notice to thousands of current and former HCI employees. They are wrong.

The Court should deny Plaintiffs' Motion. First, Plaintiffs cannot maintain a nationwide collective action in Minnesota because Minnesota courts lack personal jurisdiction over HCI for claims by nonresidents that did not work in Minnesota. Second, many of the putative plaintiffs—as many as 1,700—are subject to individual arbitration. The Court should not issue notice to individuals who cannot join this litigation. Finally, Plaintiffs cannot prove that they and the putative collective were treated similarly and—importantly—that such treatment was unlawful. The material questions at issue here – were

the workers employed by HCI while traveling, what did they do while traveling, how did they travel, and when – do not present common answers. Ultimately, even the "modest factual showing" standard so aggressively urged by Plaintiffs cannot vitiate this Court's obligation, consistent with Supreme Court direction, to ask whether this case is "appropriate" for collective treatment. *See Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165 (1989). It is not. Plaintiffs Motion must be denied.

## FACTUAL BACKGROUND

### I.   HCI IMPLEMENTS MEDICAL RECORDKEEPING SOFTWARE.

The CJS Solutions Group, LLC d/b/a The HCI Group ("HCI") is a technology company that provides information technology solutions for the healthcare industry. HCI is incorporated in the State of Florida and its principal place of business is in the State of Florida. (Comp. ¶¶ 10, 12.) HCI partners with vendors to develop tailored technology solutions for medical record keeping, and then it helps establish that technology at the its client's hospital or clinic. (Declaration of Ralph "Randy" Grams Jr., ("Grams Decl.") ¶ 3.) "Epic" software is a particular brand of medical record keeping software offered by HCI. (Transcript of Deposition of Joyce Vallone ("Vallone Dep.") at 14, attached to the Declaration of Claire Deason ("Deason Decl.") as Exhibit 1.) After customer training, HCI manages a "go-live" event at the client's hospital or clinic when the new software begins managing records in real-time. (Grams Decl. ¶ 5.) The event typically lasts several weeks. (Vallone Dep. 30.)

Several different groups of hourly paid, non-exempt workers are involved at "go live" events. HCI enlists consultants who work directly alongside "at-the-elbows" of the

healthcare provider's employees. (Grams Decl. ¶ 6.) These consultants are referred to as "ATEs" or "Epic Activation Specialists." (*Id.* ¶ 6; Vallone Dep. Ex. 4.) HCI also enlists "certified trainers" to work at "go live" events. (Grams Decl. ¶ 7). These trainers train ATEs for the project, and perform other instructional tasks at the event, for both internal and clinic audiences (*Id.*) HCI also enlists "analysts" (also referred to as "credentialed trainers") to work at the "go-live" event. (*Id.*) Analysts are responsible for designing and building the technology solution for the clinic customer, and overseeing its implementation during the "go live" event. (*Id.*) Finally, HCI's project managers and supervisors are on-site at "go-live" events to manage and supervise the process and the staff. (*Id.* ¶ 9.)

Plaintiffs Vallone and Ikogor worked for HCI only as ATEs. (Dkt. 30-3, Declaration of Joyce Vallone ("Vallone Decl.") ¶ 4; Dkt. 30-4, Declaration of Erasmus Ikogor ("Ikogor Decl.") ¶ 4.) Despite seeking to represent a much broader group, Vallone and Ikogor have information (and present evidence) relating **only** to ATEs. (*Id.*) Neither have information regarding whether non-ATEs are compensated for time spent traveling. Vallone's deposition testimony makes this clear:

Q:     So is it fair to say that your knowledge about how you understand people were paid . . . for travel time or not is limited to the ATE group . . . that you worked with and were a part of?

A:     Yes.

Q:     [Y]ou don't have any knowledge about how any ATEs were paid and whether or not travel was paid . . . outside of the Mayo project for HCI?

A:     I do not know.

Q:     Were you familiar with any other types of employees that HCI had onsite at the Mayo project?

      A:     No.

(Vallone Dep. 77-78.)

## II.    HCI EMPLOYS A UNIQUE GROUP OF "ATEs" FOR EACH GO LIVE.

For each "go live" project, HCI identifies a unique group of ATEs to work "at-the-elbows" of the healthcare provider's employees. (*E.g.*, Vallone Dep. 32.) ATEs are hired just for the project; they begin their employment when they arrive at the project location and are terminated when there work on the project is done. (Grams Decl. ¶ 12.) During the recruiting process, recruits are informed of the location of the project as well as other details, allowing individuals to factor the necessity to travel into their decision whether to accept or decline HCI's offer. (*E.g.*, Vallone Dep. Ex. 2.) Some ATEs are able to work in their home state, while others must travel to the state in which the "go live" occurs. Travel—even for significant distances—is normal travel in the context of work for HCI. Indeed, it is true for both Named Plaintiffs Vallone and Ikogor. Ikogor, for example, testified that he lives part time in Florida with his mother, and part time in Georgia, with his sister. (Ikogor Dep. 17-18.) He traveled to between 10 and 20 to work as an ATE for myriad different employers, sometimes by car and sometimes by plane. (*See id.* 18-19, Ex. 2 (listing projects to which Ikogor has traveled).) Individuals are free to accept or decline HCI's offer of employment on a project-by-project basis. In other words, working one "go live" for HCI is not a commitment to working any other projects.  (Grams Decl. ¶ 12; *see also* Vallone Dep. 62-63 (declining to work a "go live" for HCI in order to spend time with her family).)

## A.    Each "Go-Live" Project is a Stand-Alone Event.

For each project, ATEs complete a new set of onboarding documents and attend a unique orientation session. (*E.g.*, Ikogor Dep. 67-70.) Logistics vary from project to project—HCI sometimes arranges flights and hotel rooms for ATEs as necessary and, at other times, HCI reimburses ATEs for travel and lodging arrangements they make themselves. (*See* Grams Decl. ¶¶ 14-15.) ATEs are not required to use any particular method of travel to get to the site of the go-live project. Some ATEs drive their personal vehicles, some rent a vehicle, others travel via airplane, and others carpool. (*Id.*) Ikogor, for example, flew to some projects but chose to drive his personal vehicle to others. (Ikogor Dep. 96-97.) Naturally, the time at which travel occurs is unique to each ATE for each trip to and from each project. Some ATEs work only one project for HCI, while others work multiple projects. (Grams Decl. ¶ 19.) At the end of each project, HCI terminates ATEs' employment before the return travel occurs. (*Id.* ¶ 12.)

## B.    For Each Project, ATEs' Employment Begins at Orientation.

ATEs typically receive a conditional offer letter from HCI for a "go-live" project several days or weeks before the project begins (Grams Decl. ¶ 13; *see also* Vallone Dep. Ex. 4.) If they accept the offer, prior to arriving at the go-live job site, ATEs may be required to submit proof of immunizations via email (required by some clinic settings) (Grams Decl. ¶ 13; Ikogor Dep. 74 (testifying that it takes a "couple seconds" to submit the necessary documentation)). ATEs also typically exchange some communication with project coordinators to schedule their travel to the job site. (Grams Decl. ¶ 13.) Aside from emailing necessary immunization paperwork and reviewing their travel arrangement,

6

ATEs do not perform any tasks for HCI prior to orientation or their first shift. (*Id.*) ATEs cannot perform the work for which they are hired until they are physically present in the "go live" location. (Vallone Dep. at 40 (Q: "And obviously you couldn't be guiding and training any nurses until you got to Rochester and into the Mayo clinic, right?" A: "Right."); Grams Decl. ¶ 13.)

### C.    ATE Travel From Hotel to Worksite is Disparate.

Once arriving at the location of the go-live, most ATEs reside at a hotel for the duration of the project, though this is not required by HCI. (Grams Decl. ¶ 15.) Some ATEs prefer to stay with friends or family, if they have contacts in the area. (*Id.*) When ATEs accept a job near the area where they live, it is not uncommon for them to drive directly from their homes to the job site, and back at the end of the workday. (*Id.*) ATEs' work is limited to attending orientation or training at the beginning of the "go live" project, and then performing the "at the elbow" services they provide during the go-live event. (*Id.* ¶ 16.) ATEs do not perform any work-related tasks in the hotel; ATEs' work is entirely limited to the time they spend in the clinic where they assist new technology users; none of their work tasks occur outside the clinic. (*Id.*) This is true for the time spent traveling from the hotel to the worksite; HCI does not require ATEs to complete any tasks or responsibilities for this work during their travel to and from the job site or during their travel between their hotel (or other accommodation) and the clinic location each day of the "go live" event. (*Id.*)

ATEs use different methods of transportation from hotel to worksite. (*Id.* ¶ 15.) For example, for transportation to the work site from his local hotel, Ikogor has taken company-

provided shuttles, company-provided rental cars, public transportation, and his own personal vehicle. (Ikogor Dep. 99-102 (Q: "How do you get from the hotel to your work site for the go-live? . . . Is it different from project to project?" A: "Yeah, it's different. Just depends on which one you're referring to.").)

> **D.      ATEs' Employment Ends When They are "Cut" or "Tapered" From the Project.**

Towards the end of the "go live" event, HCI project managers determine how many ATEs are needed for each day remaining in the event. (Grams Decl. ¶ 18.) This determination fluctuates based on the customer's progress with the technology, and typically fewer ATEs are needed as the project continues. (*Id.*) So, ATEs may be terminated (also referred to as "tapered" or "cut") early, or in some occasions, an ATE may be asked to stay at the project longer than anticipated. (*Id.*) Once an ATE is terminated, they complete their work shift and leave the project; they do not complete any additional tasks for the "go live" event once leaving the project site (*Id.*; Ikogor Dep. 35 (being "cut" means "they don't need your services anymore").)

Once "cut" or "tapered," ATEs travel to a location of their personal choice. Some travel home, others travel to another HCI worksite, and still others travel to worksites for other companies. (Grams Decl. ¶ 19.) While some ATEs work on multiple projects close in time, most ATEs spend, at a minimum, several weeks or months between HCI projects. (*Id.*) ATEs are not employees of HCI during this time. (*Id.*) Many ATEs work for other technology companies, traveling from HCI projects directly to other projects for other

companies, or traveling directly from projects completed for other companies to HCI projects. (*Id.*)

### E.     Lead ATEs Have Different Job Duties than Non-Lead ATEs.

HCI may designate "Lead" ATEs at certain projects. Ikogor testified that, as a Lead, HCI assigned him job duties that went beyond those of the ordinary ATE. (Ikogor Dep. 114-115.) These additional duties affected the tasks he performed during some of his travel time. For example, as a Lead on one project in Minnesota, HCI provided Ikogor a rental car. (*Id.* at 104-106.) HCI asked Ikogor to "pick up . . . other consultants" and transport them to the work site. He also brought other ATEs to get food, launder clothing, and shop at places like Wal-Mart. (*Id.*) During another project, when he and other employees commuted to and from the worksite on a bus, Ikogor was tasked with checking attendance for other ATEs. (*Id.* at 121.) Non-Lead ATEs did not have similar responsibilities during their travel. (*Id.* at 106-107.) Indeed, on projects at which Ikogor was not a Lead, he testified that he had no responsibilities during his commute. (Ikogor Dep. 114-115 (Q: "And you didn't have to do that when you weren't acting as a lead?" A: "No, didn't do any of that, no").)

### III.   VALLONE AND IKOGOR WORKED ON THE MAYO CLINIC "GO-LIVE" EVENT IN ROCHESTER, MINNESOTA.

#### A.   Vallone Performed No Work While Commuting to or from the Mayo Clinic.

Vallone lives in New York. (Vallone Dep. 10.) She has worked with medical recordkeeping technology since 2004. (*Id.* at 13-14.) Vallone testified that she is "always" a contractor with these companies. (*Id.* at 19.) "I've never been an employee."[1] (*Id.* at 22.)

In March 2018, HCI recruited Vallone to work the Mayo Clinic "go-live" event. (Vallone Dep. 33, Ex. 2.) The recruiter made clear that the project was "a 2-4 week assignment" with an arrival date of April 29, orientation sessions from April 30 through May 4, and a "go live" date of May 5. (*Id.*) Vallone accepted HCI's offer. (*Id.*; *see also* Exs. 3, 4.) Prior to traveling to the Mayo Clinic, Vallone performed no work at HCI's direction—Vallone completed onboarding paperwork, took a survey and a drug test, and submitted records to HCI, such as proof that she had received the immunizations required of hospital workers. (Vallone Dep. 34-37; *see also* Vallone Dep. Ex. 4 (offer letter outlining onboarding expectations).) She performed no substantive work for HCI prior to arriving at the Mayo Clinic. (*Id.* at 40.)

Vallone flew from New York to Minneapolis on April 29, 2018 for approximately four hours. (Vallone Dep. 47, Ex. 6.) She departed New York at 11:55 a.m. EST, and landed

---

[1] Vallone claims not to understand the distinction between an independent contractor and an employee. (Vallone Dep. 22-23.) Nonetheless, in a separate lawsuit Vallone has commenced against a different company, Vallone contends the company misclassified her as an independent contractor. (Vallone Dep. Ex. 16 (Complaint filed in *Vallone, et al. v. Santa Rosa Consulting Inc.*, No. 19-cv-11779 (E.D. Mich. June 14, 2019).)

in Minneapolis at approximately 3:40 p.m. CST. (*Id.* Ex. 6.) After she "stood and waited" at the airport (Vallone Dep. 50), HCI bussed Vallone to a primary meeting location, and from there, Vallone went to her own hotel room in Rochester. (*Id.* 44.) That evening, at around 11:00 p.m., Vallone learned that HCI was cancelling the orientation session previously scheduled for the next day. (*Id.* Ex. 8.) So, Vallone spent the day resting. (Vallone Dep. 45 (Q: "So on the 30th of April, . . . you did not go to the hospital for any reason whatsoever to do any work?" A: "No.").)

According to Vallone, her employment with HCI at the Mayo Clinic began when she arrived at orientation the next day, May 1, 2018, and her employment ended when she was "tapered" on May 16, 2018. (*Id.* at 22, 68; Ex. 11.) Vallone attended orientation May 1 through May 4 and worked the "go-live" event from May 5 through May 16. (*Id.* at 60-61.) During the "go-live," Vallone worked the night shift from 7:00 p.m. to 7:00 a.m. (*Id.*) asked Vallone to work on another project, but she declined. (*Id.* at 62.)

On May 17, the day after Vallone's employment ended, she flew from Rochester, Minnesota, departing at 2:40 p.m., to Rochester, New York, arriving at 9:54 p.m., a flight that took approximately six hours accounting for the time zone difference. (Vallone Dep. 69.) Vallone performed no work for HCI as she traveled home. (*Id.* (Q: "When you were on the flight in on the 29th and the flight out on the 17th, were you able to do whatever you wanted during your flight time?" A: "Yes.").) Indeed, in Vallone's declaration submitted in support of her Motion, she makes no mention of performing any work for HCI prior to her arrival at the Mayo Clinic on May 1. (*See generally* Vallone Decl.) Nonetheless, Vallone is clear that she is seeking compensation only for (1) her time spent traveling to

and from Minnesota (during which she performed no work), and (2) April 30, a day scheduled for orientation that was cancelled, the day prior to when she claims her employment began. (Vallone Dep. 89.)

Ikogor has also worked for "numerous technology companies" as an ATE. (Ikogor Decl. ¶ 4.) He has worked for these companies "all over the U.S.," despite living in Florida and occasionally staying with his sister, who lives in Georgia. (Ikogor Dep. 17-18.) He has worked for HCI on 10 "go live" projects around the country since June 2017, three at the Mayo Clinic in Minnesota. (Ikogor Dep. Ex. 2 at 4-5.) He worked for multiple other companies during this period as well. (Ikogor Dep. 15-17.)

On March 12, 2018, Ikogor executed an offer letter to work as an ATE at the Mayo Clinic in April and May 2018 in Rochester, Minnesota. (*Id.* Ex. 7.) Like Vallone, he spent a short period, a "couple seconds," making sure HCI had all necessary paperwork, authorizations, and immunizations. (*Id.* at 74.) He did no substantive work for HCI until his arrival at the Mayo Clinic for orientation. (*Id.* at 53-54.)

Ikogor flew from Atlanta to Minneapolis on April 29, 2018 for approximately six hours. (Deason Decl. Ex. 3.) He then rode an HCI-provided shuttle from the airport to his hotel. (Ikogor Dep. 45.) He performed no work for HCI while traveling to the Mayo Clinic. (*Id.* at 53 (Q: "[Are there any] tasks that HCI asks you to do on the plane while you're traveling to a project?" A: "No, not that I know of.").) That evening, like Vallone, Ikogor received notice that the orientation scheduled for April 30 had been rescheduled. (*Id.* at 77, Ex. 8.) As a result, Ikogor, like Vallone, had "nothing to do" on April 30. (Ikogor Dep. 79.) He did no work for HCI prior to attending orientation on May 1. (*Id.* at 53, Ex 8.)

Following orientation, Ikogor worked the night shift during the "go live" as a "Lead" on the project. (Ikogor Decl. ¶ 7.) Ikogor had different job duties than ordinary ATEs, and in particular, alleges that he had responsibilities assigned to him during his commute from hotel to work site.

HCI "cut" Ikogor from the Mayo Clinic project on May 15, and he flew out of the Minneapolis airport the following day, May 16, 2018. (Ikogor Dep. Ex. 2 at 5.) He did not fly home; from Minnesota, he flew to another HCI project at the Barnes Jewish Clinic in St. Louis, Missouri. (*Id.*) The flight took approximately an hour and thirty minutes. (Deason Decl. Ex. 3.)

## ARGUMENT

Plaintiffs' Motion should be denied because the Court lacks personal jurisdiction over HCI for claims brought by HCI employees who neither lived nor worked in Minnesota, many of the putative collective are subject to mandatory arbitration, and no common question binds the collective.

## I. THE COURT'S PERSONAL JURISDICTION OVER HCI IS LIMITED TO CLAIMS WITH A CONNECTION TO MINNESOTA.

The Court should deny the Motion because Plaintiffs' proposed collective includes individuals with claims that cannot be sustained in this Court. The Court lacks personal jurisdiction over HCI as to claims by individuals who neither live nor worked for HCI in Minnesota. *E.g.*, *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773 (2017). HCI is not a Minnesota corporation; Florida is HCI's principal place of business and state of incorporation. (Compl. ¶¶ 10, 12). As a result, the Court's personal jurisdiction

over HCI is limited to claims that either (1) arose in Minnesota or (2) are asserted by Minnesota residents.

In *Bristol-Meyers*, the U.S. Supreme Court explained that a connection must exist between the forum state and the underlying controversy in order for a forum court to exercise personal jurisdiction over a non-resident defendant. Two types of personal jurisdiction exist, general personal jurisdiction and specific personal jurisdiction. *Id.* at 1779-80 (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). A court with general personal jurisdiction over a defendant may hear any claim against it, even if the events giving rise to the claim occurred in a different state. *Id.* For an individual defendant, courts in the defendant's state of domicile may exercise general jurisdiction. *Id.* For a corporation, "it is an equivalent place, one in which the corporation is fairly regarded as at home." *Id.*

Specific personal jurisdiction is far more limited—a court with specific personal jurisdiction over a defendant may hear only claims that arise out of or relate to the defendant's contacts with the forum state. *Id.* "There must be an affiliation between the forum and the underlying controversy, principally an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (citation omitted). This is true even if the claims of nonresidents are similar to the claims of residents. *Id.* 1783-84. If there is no such specific connection, the forum court lacks personal jurisdiction over the defendant. *Id.* ("What is needed—and what is missing here— is a connection between the forum and the specific claims at issue."). If such a connection

14

exists, then the forum court has jurisdiction only over claims arising out of the connection with the forum state. *Id.* at 1779-80.

*Bristol-Meyers* addressed the exercise of personal jurisdiction by a state court, but the same rule applies to federal courts in FLSA cases.[2] *See, e.g.*, *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 850–51 (N.D. Ohio 2018) ("The Court finds that *Bristol-Meyers* applies to FLSA claims, in that it divests courts of specific jurisdiction over the FLSA claims of non-Ohio plaintiffs against Reliable."); *Pettenato v. Beacon Health Options, Inc.*, No. 19CV1646JPOBCM, 2019 WL 5587335, at *6 (S.D.N.Y. Oct. 25, 2019) ("I decline to conditionally certify a nationwide collective action. I conclude that, in light of [*Bristol-Meyers*], this Court may not exercise specific personal jurisdiction over the FLSA claims of out-of-state plaintiffs against these defendants."); *Szewczyk v. United Parcel Serv., Inc.*, No. CV 19-1109, 2019 WL 5423036, at *7 (E.D. Pa. Oct. 22, 2019); *Turner v. Utiliquest, LLC*, 3:18-cv-00294 (M.D. Tenn. July 16, 2019); *Roy v. FedEx Ground Package Sys., Inc.*, 353 F. Supp. 3d 43 (D. Mass. 2018).

---

[2] *Bristol-Meyers* explicitly left "open the question whether the Fifth Amendment imposes the same restrictions of the exercise of personal jurisdiction by a federal court." 137 S.Ct. at 1784. There is no basis upon which to limit the application of *Bristol-Meyers* to the specific claims at issue in that case (mass tort claims) or state courts. *E.g.*, *Maclin*, 314 F. Supp. 3d at 851. To the extent that Plaintiffs rely upon a line of cases concluding that *Bristol-Meyers* does not apply to federal courts in FLSA cases, the Court in *Roy v. FedEx Ground Package Sys., Inc.*, 353 F. Supp. 3d 43 (D. Mass. 2018), explains well the problem with these cases. *See also Chavira*, 2019 WL 4769101 at *4-6 (analyzing both lines of case law and deciding to follow *Roy* in applying *Bristol-Meyers* in FLSA cases). For the reasons expressed in *Roy* and *Chavira*, this Court should apply *Bristol-Meyers* and decline to follow courts that improperly limit its holding.

Federal Rule of Civil Procedure 4(k) provides that the service of a federal court summons establishes personal jurisdiction over a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located" or "when authorized by a federal statute." The FLSA, the only statute at issue here,[3] does not provide for nationwide service of process. *E.g.*, *Chavira v. OS Rest. Servs., LLC*, No. 18-CV-10029-ADB, 2019 WL 4769101, at *3 (D. Mass. Sept. 30, 2019) (striking consent forms filed in an FLSA case by non-resident individuals). Rule 4(k) thus directs the Court to decide whether the exercise of personal jurisdiction is appropriate under the U.S. Constitution (as discussed in *Bristol-Meyers*) and Minnesota state law. *Id.*; *see also Maclin v. Reliable Reports of Texas, Inc.*, 314 F. Supp. 3d 845, 848-49 (N.D. Ohio 2018) ("If personal jurisdiction exists under the forum state's long-arm statute, the Court must then determine whether personal jurisdiction comports with the Due Process Clause of the United States Constitution.").

Similar to the U.S. Constitution, Minnesota courts constrain their exercise of personal jurisdiction to non-resident corporations that (1) own property within the state, (2) transact business within the state, (3) commit acts in the state causing injury, or (4) commit acts outside of the state causing injury within the state. Minn. Stat. § 543.19. Whether considering the U.S. Constitution or Minnesota law, it is clear "there must be an affiliation between the forum and the underlying controversy" in order for the Court to exercise personal jurisdiction over HCI. *Bristol-Meyers*, 137 S. Ct. at 1779-80.

---

[3] Plaintiffs have asserted state-law claims, but their Motion is limited to their FLSA claims so the state court claims are not addressed at this time. (Pl.'s Mem., Dkt. 28, at 6.)

There is no evidence that HCI has an office in Minnesota, property in Minnesota, or any significant, ongoing operations in Minnesota. HCI's connection to Minnesota is limited to the services it has provided to clients located in Minnesota (during the relevant time, three events at the Mayo Clinic (Grams Decl. ¶ 21)) and the ATEs whom it has recruited from Minnesota. HCI employees generally and ATEs specifically who do not reside in Minnesota and that did not work for HCI in Minnesota during the limitations period (1) did not negotiate HCI's offer of employment in Minnesota, (2) did not execute offer letters or onboarding documents in Minnesota, (3) did not travel to or from Minnesota at the behest of HCI, (4) were not subject to HCI's travel pay practices in Minnesota, and (5) did not suffer the harm for which they seek damages (noncompensation for time spent traveling) in Minnesota. Claims by such individuals have no connection to Minnesota whatsoever. The Court lacks personal jurisdiction over HCI as to claims that could be made by those individuals. *See Pettenato*, 2019 WL 5587335 at *6. Indeed, the only basis alleged by Plaintiffs for the Court to exercise personal jurisdiction over HCI is that it "conducts business in this judicial District." (Compl. ¶ 3.) The Court should deny Plaintiffs' motion for certification of a nationwide class and exclude all individuals who neither live nor worked for HCI in Minnesota.[4]

---

[4] Should Plaintiffs argue that HCI should have raised the issue of personal jurisdiction earlier, this argument fails. At the time HCI answered Plaintiffs' Complaint, only Vallone and Ikogor were Plaintiffs; they both have claims with a Minnesota connection. As to any broader group, HCI asserted in its Answer that "[c]ertification of a collective action or class action, as applied to the facts and circumstances of this case, would constitute a denial of [HCI]'s Due Process rights." (Dkt. 13 ¶ 10.) As to unnamed and unknown class members, they are not plaintiffs in the case. *See Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 593 (2013) ("[A] nonnamed class member is [not] a party to the class-action litigation

All that Plaintiffs need do if they were truly interested in a nationwide action is file their claims in the Northern District of Florida where HCI resides. As the Northern District of Ohio noted in *Maclin*: "This decision does not prevent the Ohio and out-of-state plaintiffs from filing a nationwide collective action in the State that has general jurisdiction over Reliable, Texas. Alternatively, non-Ohio plaintiffs may file collective FLSA actions in their respective home states." That Plaintiffs chose to file in Minnesota is even more puzzling given that Ikogor is a Florida resident. (Compl. ¶ 6.) The Court should reject any invitation by Plaintiffs to ignore Supreme Court precedent and the boundaries of personal jurisdiction for the sake of enlarging their putative collective action. *See Chavira*, 2019 WL 4769101 at *6. HCI is entitled to due process, and to afford HCI due process, this Court must decline to certify a nationwide collective action and exclude from the collective any individuals who neither lived nor worked for HCI in Minnesota.

## II. HCI EMPLOYEES WHO AGREED TO INDIVIDUALLY ARBITRATE THEIR CLAIMS ARE NOT PROPERLY INCLUDED IN A PUTATIVE COLLECTIVE ACTION.

The sole purpose of Court-authorized notice is to inform individuals of the right to join this lawsuit so that they can make "informed decisions about whether to participate." *Hoffmann-La Roche,* 493 U.S. at 170-171. For that reason, notice is only sent to those who worked within the applicable statute of limitations period. Providing notice to someone precluded from joining this action would be futile, a waste of judicial resources, and

_____

before the class is certified.") (internal quotations and citations omitted). HCI cannot waive a defense as to individuals not yet party to this lawsuit.

significantly prejudicial to HCI. Accordingly, employees who have executed arbitration agreements with HCI should be excluded from any notice in this litigation.

### A.   HCI Employees Execute Arbitration Agreements as a Matter of Course.

In October 2018, HCI and its employees, including project based ATEs, began executing agreements to arbitrate any claims between the parties on an individual basis. (*See* Grams Decl. Ex. 1.) The Agreement provides that the parties will arbitrate on an individual basis "all disputes, claims or controversies, past, present or future . . . arising out of or related to" their employment with HCI. It covers claims "based upon or related to . . . overtime, wages or other compensation . . . all claims arising under . . . the Fair Labor Standards Act . . . [and] any state or local statutes, if any, addressing the same or similar subjects." (*Id.*) The Agreement requires that any covered disputes are brought on an individual—and not class or collective—basis. (*Id.*) Based on the plain terms of the Agreement, any signatory cannot participate in this lawsuit. Over 1,700 ATEs have signed these agreements. (*Id.* ¶ 20.)[5]

---

[5] Plaintiffs are well aware that a large portion of the putative collective that they seek to certify has executed agreements to arbitrate employment claims against HCI on an individual basis. HCI raised this issue with Plaintiffs' counsel long before Plaintiffs' Motion was filed, and has provided Plaintiffs' counsel with a sample of the arbitration agreement at issue. (Deason Decl. Exs. 5, 6.) Moreover, as to three Opt-In Plaintiffs (Quintin Jackson, Adetola Ojo, and Sanjuanita Ramos), HCI has specifically asked that they withdraw their consents to join this lawsuit based on arbitration agreements that they have signed. (Grams Decl. Ex. 1.) Plaintiffs have offered no persuasive reason why they should not abide by their agreements, and yet they refuse to withdraw from the lawsuit. As a result, HCI has noticed a Motion to Compel Arbitration. (Dkt. 36.) Even with this knowledge, Plaintiffs' Motion fails to apprise the Court that roughly 1,700 of the individuals that they would like to include in the collective cannot participate in this lawsuit. (*See generally* Dkt. 28.)

**B.      Notice Should Not Issue To Arbitration Agreement Signatories.**

Plaintiffs nonetheless ask the Court to issue notice to individuals who have signed arbitration agreements specifically covering the claims at issue here. This is not the purpose of court-authorized notice, which is to notify putative class members of their *right to join* the lawsuit. *See Sanchez v. Q'Max*, No. 17-cv-01382-CMA-KLM, 2018 WL 107113, at *1 (D. Colo. Feb. 27, 2018) (denying motion for conditional certification; finding that authorizing notice "would be a waste . . . and an unnecessary redundancy"). Employees who have consented to arbitration have no such right and should not receive notice.

Several courts have recognized that individuals should not be notified of a lawsuit in which they cannot participate. In *In re JPMorgan Chase & Co.*, 916 F.3d 494 (5th Cir. 2019), the district court conditionally certified a collective of current and former call center employees. Over Chase's objection, the collective included many employees who had signed agreements to arbitrate claims against Chase on an individual basis. *Id.* at 498. Chase asked the district court to certify its order for interlocutory appeal, but the district court declined Chase's request. Chase requested a stay to avoid the issuance of notice while it appealed the district court's decision, which the district court also declined. *Id.* Chase petitioned to the Fifth Circuit for a writ of mandamus and a stay pending resolution of the writ. The Fifth Circuit stayed the case and, after briefing on the petition, the Fifth Circuit held "that the district court appears to have erred by ordering that notice be sent to employees who signed arbitration agreements (the "Arbitration Employees") and by requiring Chase to provide personal contact information for the Arbitration Employees. *Id.*

at 498. The Court clarified that employees have no right to receive notice of a lawsuit that they cannot join:

> Plaintiffs insist . . . that all putative collective members—including Arbitration Employees—have a right to be given notice of any FLSA claims that they might have, even if they cannot join the current collective action. Not so. Neither FLSA's text nor *Hoffmann-La Roche* offers any support whatsoever for that notion.

*Id.* at 503. This Court should follow *JP Morgan* and decline to issue notice to HCI employees who have signed arbitration agreements.[6] *See also Bracamontes v. Bimbo Bakeries U.S.A., Inc.*, 2017 WL 4621276, at *1 (D. Colo. Aug. 3, 2017) ("Plaintiffs' suggestion of giving notice to *all* of the defendant's [sales representatives] to only then dismiss numerous of these employees after the opt-in is [] unnecessarily complicated.") *Hudgins v. Total Quality Logistics, LLC*, No. 16 C 7331, 2017 WL 514191, at *4 (N.D. Ill. Feb. 8, 2017) (limiting notice to "only those potential members who have not signed arbitration agreements"); *Dietrich v. C.H. Robinson Worldwide, Inc.*, 18-C-4871, 2019 U.S. Dist. LEXIS 48555, at * 1 (N.D. Ill. Mar. 20, 2019).

To notify individuals of the precise type of lawsuit that they agreed not to join is, again, highly prejudicial to HCI, a waste of judicial resources, and contradictory to a clear federal policy favoring arbitration. *In re JPMorgan Chase & Co.*, 916 F.3d at 502 ("[A]lerting those who cannot ultimately participate in the collective 'merely stirs up litigation,' which is what *Hoffmann-La Roche* flatly proscribes.") (citation omitted); *see*

---

[6] The Seventh Circuit also agreed to address this issue on interlocutory appeal following the district court's decision to issue notice to arbitration agreement signatories. *Facebook, Inc. v. Biggers*, No. 19-8011, slip op. at 1-2 (7th Cir. May 3, 2019).

*also Epic Systems Corp. v. Lewis*, 584 U.S. ___, 138 S. Ct. 1612 (2018) ("Congress directed courts to abandon their hostility and instead treat arbitration agreements as 'valid, irrevocable, and enforceable'") (citations omitted); *E.E.O.C. v. Woodmen of World Life Ins. Soc.*, 479 F.3d 561, 565 (8th Cir. 2007). The Court should exclude from any notice all employees who have signed agreements to arbitrate claims with HCI.

## III.   PLAINTIFFS' HAVE NOT MET THEIR BURDEN TO SHOW A SIMILARLY-SITUATED GROUP FIT FOR COLLECTIVE TREATMENT.

Arguing that they have no legal burden to meet whatsoever, Plaintiffs ask the Court to invite thousands of individuals to participate in this litigation based upon overbroad generalizations regarding HCI's workforce and its pay practices. Plaintiffs ask the Court to ignore significant differences in their defined collective and, indeed, significant differences in their own claims, in order to certify a collective. Plaintiffs cannot meet their burden, however light, and their Motion should be denied.

A plaintiff has no automatic right in a collective action under 28 U.S.C. § 216(b) for court-supervised notice. *See Hoffmann-La Roche Inc*, 493 U.S. at 171. District courts "have discretion, in appropriate cases to implement" the collective action mechanism "by facilitating notice to potential plaintiffs." *Id.* at 169. Individuals may bring an FLSA action in a representative capacity only for "other employees similarly situated." 29 U.S.C. § 216(b). Plaintiffs are required to "make substantial allegations" that the collective members were subject to a "single illegal policy, plan or decision." *Romero v. Mountaire Farms, Inc.,* 796 F.Supp.2d 700, 705 (E.D.N.C. 2011) (emphasis added).

Typically, a court will apply a two-staged approach for determining whether the named plaintiff is "similarly situated" to other potential plaintiffs. *Parker v. Rowland Express*, *Inc*., 492 F. Supp. 2d 1159, 1164 (D. Minn. 2007). At the first "conditional certification" stage, a court reviews the pleadings and affidavits to determine whether the plaintiff has shown they are similarly situated to putative class members. *Id.* at 1164. Even at the conditional certification stage, Plaintiffs must set forth more than "vague allegations" with "meager factual support" regarding a single policy that violates the FLSA. *See Bramble v. Wal-Mart Stores*, No. 09-4932, 2011 WL 1389510, at *4 (E.D. Pa. Apr. 12, 2011) (standard is "not nonexistent"). Plaintiffs must also prove that their claims arise from "a manageably similar factual setting with respect to [] job requirements and pay provisions." *McLaurin v. Prestage Foods, Inc.*, 271 F.R.D. 465, 469 (E.D.N.C. 2010) (emphasis added). Absent a specific demonstration by Plaintiffs that these standards are met, "it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse." *Horne v. United Servs. Auto. Ass'n*, 279 F. Supp. 2d 1231, 1234 (M.D. Ala. 2003).

### A.    Each Putative Plaintiff Has a Unique Claim for Travel Time.

Here, the putative collective is not similarly situated with respect to the material questions of law and fact that the Court will analyze to determine the merits of Plaintiffs' claims. Those considerations are:

- Whether the individual was employed at the time of travel;

- Each individual plaintiff's mode of travel to each individual project (by flight, train, by car, etc.);

- Each individual plaintiff's "normal working hours" on each individual project;

- Each individual plaintiff's travel start and end dates and times for each trip to and from each individual project;

- Whether the individual stayed overnight for personal convenience or drove to and from home each day for the project;

- Each individual plaintiff's status as a "Lead" ATE and whether their role included special duties (like driving HCI's rental car and picking up other ATEs) arguably rendering their commute time compensable; and

- Whether each individual is entitled to compensation for a rescheduled orientation session at the Mayo Clinic in April 2018, one discrete project among the many worked by the putative collective.

The Court will need to make individualized factual findings for each putative collective member in order to determine whether—on a project-by-project, trip-by-trip basis—Plaintiffs' travel time is compensable. These distinct analyses—and their disparate outcomes—are well illustrated by Plaintiffs own claims (discussed below). No notion of judicial economy is served by such a painstaking analysis performed thousands of times over. Plaintiffs have failed to make even a modest factual showing that (1) they are similarly situated to one another, (2) their proposed collective is similarly situated, and (3) judicial economy is served by aggregating thousands of distinct claims.

      **1.    Workers Not Employed at the Time of Travel Have No Viable Claim, and Putative Plaintiffs are Disparate With Respect to the Time of Employment.**

As a preliminary matter, most Plaintiffs have no viable argument that they were employed by HCI when they traveled to or from go live projects. An "employee" under the FLSA is "any individual employed by an employer," and "employ" means "to suffer or

permit to work." 29 U.S.C. § 203(e)(1)-(g). It is undisputed that, before arriving at a project location, ATEs perform no work for HCI whatsoever. Nothing in the record suggests that Plaintiffs performed any substantive work at all for HCI while traveling to a project, and their employment did not begin until they arrived at the project specific orientation. The same is true for their travel home. Neither Vallone nor Ikogor contend that they performed work for HCI on their return flights. Indeed, as it relates to the Mayo Clinic project in 2018, Vallone and Ikogor flew out of Minnesota one day after they had been terminated from the project and HCI's employ; Vallone testified her employment ended the day before her flight. If they were not employees of HCI at the time of travel, there is simply no basis for claiming wages are due.

Additionally, the parties dispute whether travel from one HCI project to another close in time renders an ATE "employed" during the flight. For example, from the Mayo Clinic project in Minnesota, Ikogor traveled to St. Louis, Missouri to work another project for HCI. (Ikogor Dep. Ex. 2 at 8.) By contrast, Vallone returned home. (Vallone Dep. 63, Ex. 12.) Ikogor's flight from one project to another for HCI presents an entirely different analysis than Vallone's flight to her home. The Court will need to determine—on an employee-by-employee, project-by-project, and flight-by-flight basis whether traveling from one project to another close in time renders ATEs employed during the travel. This individualized analysis renders the case unsuitable for collective treatment.

### 2.   Commuting Time is Not Compensable, and Putative Plaintiffs Have Disparate Experiences With Commuting Time.

Even if ATEs are employed at the time that they travel, the parties further dispute whether time spent traveling is compensable. Under the FLSA, compensable time is time spent on a "principal activity" for the benefit of the employer, with the employer's actual or constructive knowledge. 29 C.F.R. §§ 785.7-.11. "The FLSA generally exempts employers from compensating employees for time spent 'traveling to and from the actual place of performance of the principal activity or activities" of employment." *Dalton v. Hennepin Home Health Care, Inc.*, 2016 U.S. LEXIS 108765 at *6 (D. Minn. Aug. 16, 2016); 29 U.S.C. § 254 (Portal-to-Portal Act). "Principal activities" are those that are an "integral and indispensable part of the principal activities", specifically those that are "an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform those activities." *Integrity Staffing Sols. v. Busk*, 135 S. Ct. 513, 517 (2014). "Normal travel from home to work is not worktime." 29 C.F.R. § 785.35.

Even if some putative Plaintiffs are arguably employed before arriving at a project location, and the Court is able to discern which parties those are through a collective mechanism (which it will not be able to do), those parties' commutes are not compensable because they represent normal travel from home to work. For ATEs, the "normal" travel from home to work consisted of travel via plane and car to project locations. This is particularly true for individuals who worked on HCI projects in their hometowns and returned to their homes each evening—these individuals experienced the epitome of a "normal" commute. But even a flight to and from the project location, with hotel stay for

the duration of the work, was "normal" in the context of HCI's short-term, intensive "go-live" events. "Home-to-work travel that is 'a contemplated, normal occurrence' of the employment is viewed as 'normal travel' under the regulation." *Kuebel v. Black & Decker Inc.*, 2009 U.S. Dist. LEXIS 43846, *26 (W.D.N.Y. May 18, 2009).

### 3.   Travel Away from Home During "Normal Working Hours" is Generally Compensable, but the Putative Class is Disparate With Respect to Travel During "Normal Working Hours."

The parties dispute—and the Court will need to decide—whether any particular Putative Plaintiff's commute falls within a regulation addressing overnight travel. Plaintiffs rely on 29 C.F.R. § 785.39, which provides that travel away from home is compensable if the travel occurs during an employee's "normal working hours." To resolve Plaintiffs' claims—even under the approach urged by Plaintiffs—the Court must engage in a fact-intensive inquiry unique to each member of the proposed collective. For each individual ATE, as to each individual project, the Court will need to determine (1) the ATE's "normal working hours" on the project and (2) whether the ATE's travel to or from the project location occurred, in part or in whole, during those "normal working hours." These individualized inquiries will be necessary to even determine which individuals meet the definition of the collective Plaintiffs propose. Such analysis will obliterate the theory of judicial economy underlying collective treatment. A number of courts have refused to certify a class, even conditionally, when resolution of the claims at issue would require a highly individualized, fact-intensive inquiry. *See Reich v. Homier Distributing Co., Inc.*, 362 F. Supp. 2d 1009, 1013-14 (N.D. Ind. 2005); *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1274-75 (M.D. Ala. 2004); *Morisky v. Public Service Elec. and Gas Co.*, 111 F.

Supp. 2d 493, 498 (D.N.J. 2000).  For this reason, this action is not suitable for collective

treatment, and Plaintiffs' Motion should be denied.

### 4. The Named Plaintiffs' Claims Illustrate the Disparities Within Their Proposed Collective.

Despite their contention that they are similarly situated to thousands of HCI

employees, Vallone and Ikogor themselves have distinct claims for travel time. First,

Vallone and Ikogor seek different relief. Vallone made clear in her deposition that she is

only seeking compensation only for (1) her time spent traveling to and from Minnesota

(during which she performed no work), and (2) April 30, a day scheduled for orientation

that was cancelled, the day prior to when she claims her employment began. (Vallone Dep.

89.) By contrast, Ikogor is seeking compensation for that time **and** time spent traveling

daily to and from his local hotels to project locations. Ikogor discussed in his deposition

that for certain projects, working as a Lead, Ikogor rode an HCI-provided bus, and he

performed tasks at the direction of HCI during that time (like taking ATE attendance).

(Ikogor Dep. 121-122.) For another project, HCI provided Ikogor a rental car and directed

him to pick up other ATEs on his way to the project location. (Ikogor Dep. 103-106.) He

also transported ATEs to launder clothing, eat, and shop. (*Id.*)

Second, the compensability of time spent traveling turns on the unique

circumstances of Vallone's and Ikogor's employment. As to their flight times, Ikogor flew

into and out of Minnesota entirely outside of his "normal working hours." At the Mayo

Clinic, Ikogor worked the night shift from 7:00 a.m. to 7:00 p.m. (Ikogor Decl. ¶ 7.)

However, his flights to and from Minnesota occurred during the day. (Deason Decl. Ex. 3.)

As a result, even applying Plaintiffs' theory that travel during "normal working hours" is compensable, Ikogor's travel to and from the Mayo Clinic is not compensable.

The analysis is different for Vallone. She also worked the night shift, and she flew to the Mayo Clinic during the day (from 11:55 a.m. EST to 3:40 p.m. CST). (Vallone Dep. Ex. 6.) Applying the Plaintiffs' theory, Vallone's commute to Minnesota is not compensable. However, her departing flight occurred from 2:40 p.m. Minnesota time to 9:54 p.m. New York time (8:54 CST). Under Plaintiffs' approach, only a portion of her return flight is compensable.[7]

Additionally, to the extent Vallone and Ikogor both seek compensation for time spent traveling locally, the analysis differs based on whether or not they performed HCI-directed tasks during this time. For example, both Vallone and Ikogor have taken an HCI-provided bus to and from their hotels. Vallone testified that she performed no work at the direction of HCI while riding the bus, deciding on her own to review notes that she had taken regarding the project. (Vallone Dep. 59.) Ikogor, on the other hand, testified that his job as a Lead ATE required him to take attendance on the bus. (Ikogor Dep. 121-122.) The compensability of this time turns on whether or not they performed work at the direction of HCI. *Compare Griffin v. S & B Engineers & Constructors, Ltd.*, 507 F. App'x 377, 383 (5th Cir. 2013) (time spent on busing is noncompensable where Plaintiff "neither performed any work prior to the beginning of his shift . . . nor received any work-related instructions prior to or during the bus ride") *with* 29 C.F.R. § 785.38 ("Where an employee

---

[7] Of course, Vallone's time spent flying is not compensable at all because she was not an employee or, alternatively, it was a normal commute to her worksite. 29 C.F.R. § 785.35.

is required to report at a meeting place to receive instructions or to perform other work there . . . the travel from the designated place to the work place is part of the day's work.").

Plaintiffs ask the Court to replicate this individualized inquiry and make individualized fact findings thousands of times over for every one of HCI's hourly paid, nonexempt employees. However, such a painstaking analysis—employee-by-employee, project-by-project, trip-by-trip—plainly renders this action unsuitable for collective treatment. The Court should deny Plaintiffs' Motion.

### 5. Plaintiffs Submitted No Evidence Regarding Any Group of HCI Employees Other Than ATEs.

Neither Named Plaintiff purports to have any information regarding any hourly, non-exempt workers other than ATEs (for example, certified trainers, analysts, and supervisory personnel) and yet they seek to represent all hourly, non-exempt HCI employees in this lawsuit. Vallone made clear in her deposition that she has no information regarding how non-ATE employees were paid. (Vallone Dep. 77-78.) Likewise, Ikogor has provided no information regarding the compensation of certified trainers, analysts, and HCI's management and supervisory employees. (*See generally* Ikogor Decl.; Ikogor Dep.) The Court must exclude HCI's certified trainers, analysts, and management and supervisory employees from this action. Plaintiffs have not identified any group of employees other than ATEs that may arguably be subject to a common practice.

Relatedly, Plaintiffs have not shown a common policy or practice regarding the canceled orientation on April 30, 2019, at the Mayo Clinic. HCI cancelled a single day of orientation at a single project at which the bulk of Plaintiffs' proposed class—given its

extreme over breadth—did not work. Only a narrow subset of Plaintiffs' proposed collective may even assert this claim. Moreover, Vallone and Ikogor acknowledge that they performed no work for HCI on the day of the rescheduled orientation. (Vallone Dep. 45; Ikogor Dep. 79.) This is a one-off event affecting only the ATEs who worked at the Mayo Clinic in April and May 2018, and as such, there is no basis to certify any broader group as to the cancelled orientation session.

No putative collection should be certified at all. If the Court determines that Plaintiffs have submitted sufficient evidence to support conditional certification, the Court should conditionally certify only a limited group of ATEs (the only employees uniformly not paid for travel time):

> CURRENT AND FORMER EMPLOYEES OF THE HCI GROUP ("HCI") WHO WORKED FOR HCI AS AN "ATE" WITHIN THE STATE OF MINNESOTA AT ANY TIME BETWEEN MAY 1, 2017 AND JANUARY 21, 2020, AND TRAVELED TO OR FROM MINNESOTA FOR SUCH WORK VIA COMMON CARRIER, DURING THE SAME TIME OF DAY THAT THEIR GO-LIVE SHIFTS IN MINNESOTA OCCURRED.[8]

## IV.   PLAINTIFFS' PROPOSED NOTICE PROCESS IS DUPLICATIVE, OVERLY INTRUSIVE, AND LIKELY TO CREATE CONFUSION.

Plaintiffs propose wholly improper notice forms and procedure. While HCI has summarized some of its objections to Plaintiffs' proposal below, if the Court finds that notice should issue, HCI respectfully requests that the Court order the parties to confer in an attempt to agree upon the content, form and distribution of the notice, and, to the extent the parties are unable to reach agreement, brief any outstanding disputes. *See Costello v.*

---

[8] The parties agreed to bifurcate discovery into two phases, one before and one after the Court's ruling on Plaintiffs' Motion. (Dkt. 19 at 3.) If the Court determines that notice should issue, the parties anticipate that a second scheduling order will issue providing for additional discovery. (*Id.*)

*Kohl's Illinois, Inc.*, 2014 U.S. Dist. LEXIS 124376, at *2 (S.D.N.Y. Sep. 4, 2014) ("The Court directs the parties to confer on both the form and dissemination of the notice … [and] to the extent the parties are unable to reach an agreement, identif[y] such disputes.").

### A.   A Single Notice by Mail is Reasonable.

One notice via first class mail is the preferred and most reliable method for delivering notice. It would be repetitive and unwarranted to e-mail and text the notice to the same individuals, followed by a reminder notice, as Plaintiffs propose. *See, e.g.*, *Martinez v. Rial De Minas, Inc.*, No. 16-CV-01947-RM-KLM, 2017 WL 9509950, at *2 (D. Colo. Oct. 12, 2017); *Gordon v. Kaleida Health*, No. 08-CV-378S, 2009 WL 3334784, at *11 (W.D.N.Y. Oct. 14, 2009) (denying request to post, e-mail and publicize notice and opt-in forms because notice via first class mail is more reliable).

E-mail transmission is not appropriate for notice. "Many have taken the view that putative class members' names and addresses are sufficient to ensure that notice is received." *Garcia v. TWC Admin., LLC*, No. SA:14-CV-985-DAE, 2015 WL 1737932, at *4 (W.D. Tex. Apr. 16, 2015). The same is true here.

The Court should reject Plaintiffs' request to issue notice with HCI paychecks. This proposal is entirely improper. Payroll communications convey a significant amount of information subject to a range of state and local laws. The Court should not require either party to be responsible for ensuring the notice conforms to these regulations. Moreover, the number of individuals currently receiving an HCI paycheck who are not subject to arbitration is likely very small; ATEs have routinely executed arbitration agreements since October 2018. Employees who agreed to arbitrate their claims on an individual basis cannot

join this lawsuit; distributing notice of this lawsuit to them is ineffective. Finally, enclosing notice with employees' paychecks goes far beyond the role of the Court to notify individuals of this lawsuit and creates the impression that HCI endorses this action, and controls the notice process. HCI should not be forced to effectively solicit its own employees to join a lawsuit, pay for the cost of the additional mail weight for its payroll process, or foist the inevitable business disruption of coordinating mailings, and addressing questions from employees, upon its payroll clerks.

**B.    A Notice Period of 60 Days is Appropriate.**

The Court should reject Plaintiffs' request for a 90-day notice period. Courts regularly hold that a 60-day notice period serves the goals of the FLSA and benefits the class or collective. *Simmons v. Valspar Corp.*, No. CIV. 10-3026 RHK/SER, 2011 WL 1363988, at *5 (D. Minn. Apr. 11, 2011) (rejecting Plaintiffs' request for a 90-day notice period and authorizing a 60-day notice period); *Holaway v. Stratasys, Inc.*, No. CV 12-998 (PAM/JSM), 2012 WL 12895690, at *3 (D. Minn. Oct. 30, 2012); *see also Fa Ting Wang v. Empire State Auto Corp.*, No. 14–cv–1491 (WFK), 2015 WL 4603117, at *11 (E.D.N.Y. July 29, 2015) (collecting cases in which sixty-day period is imposed). Plaintiffs have not raised any reason why the standard 60-day mailing period should be adjusted, and their proposal for a 90-day period should be denied.

**C.    The Court Should Not Issue A Reminder Postcard.**

Reminder notices are not favored, and are generally viewed as inappropriate because they go beyond what is necessary to effectuate notice. *Garcia*, 2015 WL 1737932

at *2; *In re Wells Fargo Wage & Hour Employment Practices Litig.* (No. III), No. H-11-2266, 2013 WL 2180014, at *3 (S.D. Tex. May 17, 2013). No reminder notice should issue.

### D.   Plaintiffs' Request for Contact Information is Overbroad.

Only the names and last known mailing addresses of putative collective members is necessary to affect notice properly. Yet, Plaintiffs seek a digest of other information regarding members of the putative collective—social security numbers, dates of employment, e-mail addresses, and telephone numbers. (E.g., Dkt. 28 at 8.) The putative collective has a privacy interest in their information, and in particular their social security numbers and telephone numbers. *See Holaway v. Stratasys, Inc.*, No. CV 12-998 (PAM/JSM), 2012 WL 12895690, at *3 (D. Minn. Oct. 30, 2012) (production of phone numbers "unreasonably intrusive"); *Martinez v. Cargill Meat Sols.*, 265 F.R.D. 490, 501 (D. Neb. 2009) (denying request for social security and telephone numbers for putative class members, recognizing such information is "highly sensitive"); *Taylor v. Autozone, Inc.*, No. CV-10-8125-PCT-FJM, 2011 WL 2038514, at *5 (D. Ariz. May 24, 2011) ("The production of addresses is appropriate, but in the interest of protecting class members' privacy, we will not order defendant to provide telephone numbers and social security numbers. Such information is sensitive, and putative class members may have provided personal data to defendant with the expectation of confidentiality."). The Court should order the disclosure of only names and last known mailing addresses to a court administrator to issue notice.[9]

---

[9] If the Court orders HCI to produce this information, HCI respectfully requests 30 days in which to do so.

34

**E.      The Court Should Designate An Administrator To Receive Names And Contact Information.**

The Supreme Court has recognized that "class actions serve important goals but also present opportunities for abuse[,]" and therefore, district courts have "both the duty and broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and the parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981)). Plaintiffs' counsel proposes to send notice to putative class members themselves; HCI strenuously objects to this proposal.

The Court should require notice to be sent by a neutral third party administrator obligated to keep putative collective members' personal information confidential. Other courts have recognized this appropriate process. *See, e.g., In re RBC Dain Rauscher Overtime Litig.*, 703 F. Supp. 2d 910, 966 (D. Minn. 2010) (approving issuance of notice through third-party administrator); *Syed v. M-I, L.L.C.*, No. 1:12-CV-1718 AWI MJS, 2014 WL 6685966, at *8 (E.D. Cal. Nov. 26, 2014) ("Upon consideration, the concerns about privacy are significant. Plaintiffs['] counsel will not be given potential class members['] contact information; that data will be provided to the third party administrator only, who must take a more active role in this process."); *Robinson v. Empire Equity Grp., Inc.*, No. CIV. WDQ-09-1603, 2009 WL 4018560, at *5 (D. Md. Nov. 18, 2009) (holding that "[t]he [notice and notification] plan should include safeguards for the privacy of potential class members, such as a requirement that notices be mailed by a neutral third-party administrator.").  This is particularly true in this case given that Plaintiffs' counsel has

previously sent a document to putative class members in a related action outside the notice process. (Deason Decl. ¶ 7, Ex. 6.)

### F.     Plaintiffs' Proposed Notice and Consent Documents are Improper.

HCI objects to the form of Plaintiff's proposed notice and proposed consent because the forms are misleading, not neutral, unnecessarily confusing, and do not provide balanced information about putative plaintiffs' rights and responsibilities. "Redlines" of Plaintiffs' proposed notice and proposed consent forms are attached to the Deason Declaration as Exhibit 7. Versions of the forms incorporating HCI's changes are attached to the Deason Declaration as Exhibit 8. HCI's revisions include the alternate class definition proposed in the discussion above.

### 1.     Plaintiffs' Proposed Notice is Misleading.

Plaintiff's proposal fails to inform plaintiffs of their obligation to participate in discovery, provide testimony, preserve documents, and possibly pay for costs. Notice "must inform the potential plaintiffs that, if they opt in, they may be asked to (1) appear for depositions; (2) respond to written discovery; (3) testify at trial and/or (4) pay litigation costs." *Bah v. Shoe Mania, Inc.*, No. 08CIV.9380LTSAJP, 2009 WL 1357223, at *4 (S.D.N.Y. May 13, 2009). Notice must also inform putative plaintiffs that, if they join, they must preserve information. *See* Fed. R. Civ. P. 54(d). This information is necessary to permit putative plaintiffs to make an informed decision about whether to join the case, and the Court should adopt HCI's revisions. *See, e.g.*, *Knispel v. Chrysler Grp*. LLC, No. 11-11886, 2012 WL 553722, at *7 (E.D. Mich. Feb. 21, 2012) ("information [about potential discovery obligations] allows potential plaintiffs to make an informed decision as to

whether they wish to opt-in to the action"); *Gonzalez v. TZ Ins. Sols.*, LLC, No. 8:13-CV-2098-T-33EAJ, 2014 WL 1248154, at *5 (M.D. Fla. Mar. 26, 2014) (notice should reflect "the consequences for opt-in Plaintiffs"); *In re Wells Fargo Wage & Hour Empl. Practices Litig.*, 2013 WL 2180014, at *3 (must "include an advisory regarding putative class members' potential discovery obligations."); *Belcher v. Shoney's, Inc.*, 927 F. Supp. 249, 254 (M.D. Tenn. 1996) (ordering instruction: "While this suit is proceeding, you may be required to respond to written questions, sit for depositions . . ."); *Sanchez v. Ocwen Loan Servicing, LLC*, No. 6:06CV1811 ORL28DAB, 2007 WL 809666, at *5 (M.D. Fla. Mar. 15, 2007) (court-authorized notice including description of plaintiffs' potential obligation to pay costs); *Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F. Supp. 2d 101, 107 (S.D.N.Y. 2003) (plaintiffs may be responsible for costs); *Garcia v. Elite Labor Serv., Ltd.*, No. 95 C 2341, 1996 WL 33500122, at *4 (N.D. Ill. July 11, 1996) (requiring: "[I]f you do not prevail on your claim, court costs and expenses may possibly be assessed against you."). The Court should adopt Defendant's proposal to inform putative plaintiffs of their obligations.

## 2.    Plaintiffs' Proposed Notice is Not Neutral.

To counter "the potential for misuse of the class device," courts must be scrupulous to respect judicial neutrality in the notice. *Hoffman-LaRoche*, 493 U.S. at 170-71, 174 ("To that end, trial courts must take care to avoid even the appearance of judicial endorsement of the merits of the action."). Plaintiff's proposed notice is not neutral.

First, Plaintiffs have not described their claims as "allegations" in their proposed notice form. This important word signals to the recipient of the notice that Plaintiffs' claims have not been proven. This simple revision is essential to neutrality.

Second, Plaintiffs' proposed notice includes multiple paragraphs describing Plaintiffs' arguments, but only one sentence noting that HCI denies Plaintiff's allegations. This imbalance increases the likelihood that a recipient of the notice will mistake it for an attorney solicitation, and not a Court-authorized and -supervised communication.

Third, Plaintiffs' proposed notice includes an improperly misleading paragraph about the statute of limitations at issue. While it is appropriate to advise putative plaintiffs that their time to pursue FLSA claims is limited, such information does not warrant a separate headlined section in a Court-authorized notice. HCI's revisions reflect the necessary information, without the inappropriate tone of incitement that Plaintiffs' proposal includes.  HCI's revisions retain the necessary substantive information about the claims at issue, but also include descriptions (of relative equal length) of HCI's position and the Court's neutrality.

### 3.    Plaintiffs' Proposed Consent Form Is Improper.

HCI's revisions to Plaintiffs' proposed consent form reflect three main changes. First, as drafted by Plaintiffs, the consent form requires any individual, by signing the form, to consent to be represented by the attorneys for Vallone and Ikogor. Individuals should be permitted to exercise the right to other counsel. *See, e.g., Shajan v. Barolo, Ltd.*, No. 10 CIV. 1385 (CM), 2010 WL 2218095, at *2 (S.D.N.Y. June 2, 2010). While the proposed *notice* form informs potential plaintiffs of this important right, the *consent* form Plaintiffs

drafted does not provide any avenue to exercise that right. HCI's revisions to the consent form rectify this problem.

Second, as discussed herein, Plaintiffs' proposed class definition creates a challenge of ascertaining what individuals traveled during "work hours," because ATEs had different shifts for different go-live events, and different flight times as well. As described above, this will require individualized analysis and the Court should deny Plaintiffs' Motion on that basis.  However, in the event the Court determines notice should issue, the consent form should include an affirmation from the opt-in plaintiff that they traveled during the same hours that they regularly worked at a Minnesota go-live event; these affirmations will assist the parties and the Court with ascertaining which individuals meet the class definition.

Finally, a consent form is not a proper avenue for soliciting information about opt-in plaintiffs' contact information. In the event an opt-in plaintiff consents to join the litigation *and* consents to be represented by Plaintiffs' counsel, Plaintiffs' counsel can contact those individuals directly as their counsel.

## V.    PLAINTIFFS ARE NOT ENTITLED TO EQUITABLE TOLLING.

The FLSA statute of limitations runs until the date a consent to join is filed. 29 U.S.C. § 256.  In certain circumstances, equitable tolling "permits courts to extend statutes of limitations on a case-by-case basis in order to prevent inequity." *Johnson v. Academy Mortg. Co.*, Case No. 2:12-cv-276-TS, 2012 WL 3886098, *3 (D. Utah Sept. 6, 2012) (internal citations omitted). A plaintiff bears the burden to establish the need for equitable tolling, and the doctrine should be invoked sparingly. *Irwin v. Dep't of Veterans Affairs*,

498 U.S. 89, 90 (1990); *see also Holaway v. Stratasys, Inc.*, No. CV 12-998 (PAM/JSM), 2012 WL 12895690, at *4 (D. Minn. Oct. 30, 2012) (Magnuson, J.) (noting that the "exceptional" remedy of equitable tolling should be used "sparingly" and declining to impose it in an FLSA action).

Plaintiffs' request for equitable tolling for the putative "opt-in" plaintiffs should be denied. Plaintiffs' have not demonstrated "extraordinary circumstances beyond" a party's control or any conduct that has "lulled the plaintiff into inaction." *See Delgado v. United States*, No. 97–1(4), 2002 WL 1763997, at *2 & n. 3 (D. Minn. July 26, 2002); *In re RBC Dain Rauscher Overtime Litig.*, 703 F. Supp. 2d at 966 (rejecting equitable tolling). Indeed, Plaintiffs do not even argue that HCI's conduct somehow "lulled" them into inaction. (Pl.'s Mem., Dkt. 28 at 30-32.) Rather, Plaintiffs contend that the time it will take the Court to rule on their motion is an "extraordinary circumstance" justifying equitable tolling. The time needed for the Court to decide this Motion is hardly "extraordinary," particularly because neither the Named Plaintiffs nor any Opt-In Plaintiff is approaching the end of the statutory period that they seek. HCI began paying ATEs as hourly, W-2 employees— bringing them within the scope of the putative collective as Plaintiff defines it—in May 2017. Therefore, until May 2020, no Named or Opt-in Plaintiff is at risk of time-barred claims. This is not an "extraordinary" circumstance that warrants tolling. *See Gamble v. Minnesota State-Operated Servs.*, No. 016CV02720JRTKMM, 2018 WL 7254598, at *1 (D. Minn. Nov. 14, 2018), *report and recommendation adopted*, No. CV 16-2720 (JRT/KMM), 2019 WL 313034 (D. Minn. Jan. 24, 2019) ("The plaintiffs have not demonstrated extraordinary circumstances that would trigger equitable tolling of the

statute."). Indeed, Plaintiffs appear to recognize that tolling may not be appropriate "at this early stage of the litigation." (Pl.'s Mem. Dkt. 28 at 32.)

Finally, Plaintiffs waited to file this action. Vallone first worked for HCI in April 2018, and Ikogor first worked for HCI as relevant here in July 2017. Yet they waited to commence this action until June 10, 2019, over a year (Vallone) and nearly two years (Ikogor) after suffering the alleged harm for which they seek to recover. No "extraordinary circumstance" or conduct by HCI caused these delays. Equitable tolling is unwarranted.

## CONCLUSION

For the reasons stated above, the Court should deny Plaintiffs Motion. Alternatively, if the Court decided to conditionally certify any group, it should certify the alternate collective HCI proposes.

Date:  January 7, 2020

s/Claire B. Deason
Jacqueline E. Kalk (#0388459)
jkalk@littler.com
Claire B. Deason (#0390570)
cdeason@littler.com
Corey J. Christensen (#0398314)
cchristensen@littler.com
**LITTLER MENDELSON, P.C.**
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402.2136
Telephone: 612.630.1000

**ATTORNEYS FOR DEFENDANT THE CJS SOLUTIONS GROUP, LLC, D/B/A THE HCI GROUP**