**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Joyce Vallone and Erasmus Ikogor, individually and on behalf of all others similarly situated, | **Court File No. 19-cv-01532 PAM-DTS** |
| Plaintiffs, | |
| vs. | **DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| The CJS Solutions Group, LLC d/b/a The HCI Group, | |
| Defendant. | |

Plaintiffs Joyce Vallone and Erasmus Ikogor ("Named Plaintiffs"), and the class and/or collective they currently represent (collectively, "Plaintiffs"), cannot establish that any of their time spent traveling to a project site for Defendant The CJS Solutions Group, LLC ("HCI") is "compensable" time. First, the employment relationships between Plaintiffs and HCI began *after* arriving at the project site, and ended at the project site, *before* any travel from the site. Second, Plaintiffs' travel to and from the project site amounted to ordinary non-compensable "home to work" travel. Third, whenever Plaintiffs were passengers on a common carrier traveling on non-working days, the time spent traveling is not compensable. Fourth, no genuine disputes of material fact suggest that Plaintiffs performed any work for HCI before or during their respective travel. Finally, as the Court previously held, the Court "has jurisdiction *only* over the claims of HCI workers who were assigned to the Mayo Clinic project or workers who are Minnesota residents." (Dkt. 49, p. 7, emphasis added). Thus, summary judgment is also warranted to limit the claims in this litigation to Plaintiffs' claims under the FLSA and Minnesota common law.

However, to extent New York common law claims remain, those claims likewise fail.[1] The Court should grant summary judgment to HCI and hold that Plaintiffs' time spent traveling to and from the project site was not compensable.

## PROCEDURAL POSTURE

On June 10, 2019, Plaintiffs Vallone and Ikogor commenced this collective and class action. (Dkt. 1.) They assert minimum-wage and overtime claims under the Fair Labor Standards Act ("FLSA") and the Minnesota Fair Labor Standards Act, recordkeeping violations, and failure to pay overtime under New York state law. (*Id.* at 11-21.) Specifically, as recognized by the Court, the Plaintiffs claims are "limited to travel time to and from remote jobsites at the beginning and end of their work assignments, and a distinct claim about cancelled training on April 30, 2018."  (Dkt. No. 49, n. 1). Approximately ten individuals have opted to join the case as putative members. (Dkts. 14, 16-17, 27, 35, 46, 47, 52, 54.)

On November 21, 2019, Plaintiffs moved to conditionally certify this matter as a collective action. (Dkt. 22.) HCI opposed Plaintiffs' motion for several reasons, including that the Court lacks personal jurisdiction over HCI as to claims by individuals who neither live nor worked for HCI in Minnesota. (Dkt. 38.) On February 5, 2020, the Court issued an Order conditionally certifying this action and limited notice to individuals:

> who engaged in out-of-town travel to or from a Minnesota jobsite for HCI or
> who resided in Minnesota at any time between June 10, 2016 and February

---

[1] On February 5, 2020, the Court limited the putative collective and class to persons who worked or resided in Minnesota. (Dkt. 49). While HCI takes the position that the Court's order necessarily rendered the claims under New York state law obsolete and, therefore, dismissed from this action, out of an abundance of caution, HCI addresses Plaintiffs' New York state law claims for overtime.

5, 2020, and whose time was neither paid under the federal minimum wage or overtime laws: (1) while engaging in out-of-town travel (with a corresponding overnight stay), wherein the travel was undertaken during the employee's normal working hours; and/or (2) on April 30, 2018, as the Mayo Clinic location, for workers who did not live in the Rochester, Minnesota area.

(Dkt. 49, p. 7, emphasis added; *see also* Dkt. 61, p. 2).[2] HCI is entitled to summary judgment on all claims.

## STATEMENT OF RELEVANT FACTS

### I.   HCI IMPLEMENTS MEDICAL RECORDKEEPING SOFTWARE.

The CJS Solutions Group, LLC d/b/a The HCI Group ("HCI") is a technology company that provides information technology solutions for the healthcare industry. HCI is incorporated in the State of Florida and its principal place of business is in the State of Florida. (Dkt. 1, ¶¶ 10, 12.) HCI partners with vendors to develop tailored technology solutions for medical record keeping, and then it helps establish that technology at the client's hospital or clinic. (Dkt. No. 40, ¶ 3.)  Among other client services, HCI provides electronic medical record ("EMR") software for clients and assists in rolling out the software onsite.  (Dkt. No. 39-1, p. 14.)  After training, HCI manages a "go-live" event at the client's hospital or clinic when the new software begins managing records in real-time. (Dkt. No. 40, ¶ 5.) "Go-live" events typically last several weeks. (Dkt. No. 39-1.)

---

[2] HCI also argued that notice was improper because hundreds of individuals within the proposed collective had signed arbitration agreements. (Dkt. 38.) HCI submitted evidence that approximately 1,700 current and former employees, including some the individuals subject to this motion, had signed the Agreements. (Dkt. 40 at ¶ 20.) In ruling on conditional certification, the Court did not exclude putative class members who executed arbitration agreements. (Dkt. 61). On February 27, 2020, the Court stayed notice pending the outcome of its motion to compel arbitration, which is currently pending. (Dkt. 67.)

Several different groups of hourly paid, non-exempt workers are involved at "go live" events. HCI enlists consultants who work directly alongside "at-the-elbows" of the healthcare provider's employees. (Dkt. No. 40, ¶ 6; Dkt. No. 39-1, Ex. 4.) These consultants are referred to as "ATEs" or "Epic Activation Specialists." (*Id.* ¶ 6; Declaration of Corey J. Christensen ("Christensen Decl.") Ex. A, Deposition of Joyce Vallone ("Vallone Dep.") at Ex. 4.) HCI also enlists "certified trainers" to work at "go live" events. (Dkt. No. 40, ¶ 7). These trainers train ATEs for the project, and perform other instructional tasks at the event, for both internal and clinic audiences. (*Id.*) HCI also enlists "analysts" (also referred to as "credentialed trainers") to work at the "go-live" event. (*Id.*) Analysts are responsible for designing and building the technology solution for the clinic customer, and overseeing its implementation during the "go live" event. (*Id.*) Finally, HCI's project managers and supervisors are on-site at "go-live" events to manage and supervise the process and the staff. (*Id.* ¶ 9.) Plaintiffs Vallone and Ikogor, along with all other Opt-in Plaintiffs, worked for HCI as ATEs. (Dkt. 30-3, Declaration of Joyce Vallone ("Vallone Decl.") ¶ 4; Dkt. 30-4, Declaration of Erasmus Ikogor ("Ikogor Decl.") ¶ 4.)

## II.     HCI EMPLOYS A UNIQUE GROUP OF "ATEs" FOR EACH GO LIVE.

For each "go live" project, HCI identifies a unique group of ATEs to work "at-the-elbow" of the healthcare provider's employees. (*E.g.*, Vallone Dep. 32.) ATEs are hired on a project-by-project basis. An ATE's employment with HCI begins when they arrive at the project location and is terminated or ends when the individual's work on the project is done. (Dkt. No. 40, ¶ 12.) During the recruiting process, recruits are informed of the location of the project as well as other details, allowing individuals to factor the necessity

to travel into their decision whether to accept or decline HCI's offer. (*E.g.*, Vallone Dep. Ex. 2.) Some ATEs are able to work in their home state, while others must travel to the state in which the "go live" occurs. Travel—even for significant distances—is normal travel in the context of work for HCI. Indeed, it is true for both Named Plaintiffs. Ikogor, for example, testified that he lives part time in Florida with his mother, and part time in Georgia, with his sister. (Christensen Decl. Ex. B, Deposition of Erasmus Ikogor ("Ikogor Dep.") at 17-18.) He traveled to between 10 and 20 different states to work as an ATE for myriad *different employers*, sometimes by car and sometimes by plane. (*See id.* at 18-19, Ex. 2 (listing projects to which Ikogor has traveled).)

Individuals are free to accept or decline HCI's offer of employment on a project-by-project basis. In other words, working one "go live" for HCI is not a commitment to working any other projects and an ATE's relationship with HCI ends when the project ends.  (Dkt. No. 40, ¶ 12; *see also* Vallone Dep. 62-63 (declining to work a "go live" for HCI in order to spend time with her family).)  In fact, at the termination of a "go live" project for HCI, an ATE is no longer employed by HCI and may accept projects or opportunities with other employers. (Ikogor Dep. 17-18.) Both Ikogor and Vallone worked for a number of different employers during the relevant time period. (Ikogor Dep. 18-19, Vallone Dep. 16-17.)

### A.    Each "Go-Live" Project Is A Stand-Alone Event.

For each project, ATEs complete a new set of onboarding documents and attend a unique orientation session. (*E.g.*, Ikogor Dep. 67-70.) Logistics vary from project to project—HCI sometimes arranges flights and hotel rooms for ATEs as necessary and, at

other times, HCI reimburses ATEs for travel and lodging arrangements they make themselves. (*See* Dkt. No. 40, ¶¶ 14-15.) ATEs are not required to use any particular method of travel to get to the site of the go-live project. Some ATEs drive their personal vehicles, some rent a vehicle, others travel via airplane, and others carpool. (*Id.*) Ikogor, for example, flew to some projects but chose to drive his personal vehicle to others. (Ikogor Dep. 96-97.) Naturally, the time at which travel occurs is unique to each ATE for each trip to and from each project. Some ATEs work only one project for HCI, while others work multiple projects. (Dkt. No. 40, ¶ 19.) At the end of each project, HCI terminates ATEs' employment before the return travel occurs. (*Id.* ¶ 12.) At the end of each project, an ATE is not required to return home or required to report to any facility or location operated by HCI.  Once the "go-live" project ends, an ATE's relationship with HCI ends and the ATE is free to decide when to leave the city or town where the "go-live" project occurred and where to go. (Dkt. 40 ¶ 12.)

## B.    For Each Project, ATEs' Employment Begins At Orientation.

ATEs typically receive a conditional offer letter from HCI for a "go-live" project several days or weeks before the project begins (Dkt. No. 40, Decl. ¶ 13; *see also* Vallone Dep. Ex. 4.) If they accept the offer, prior to arriving at the "go-live" project site, ATEs may be required to submit proof of immunizations via email (required by some clinic settings) (Dkt. No. 40, ¶ 13; Ikogor Dep. 74 (testifying that it takes a "couple seconds" to submit the necessary documentation)). ATEs also typically exchange some communication with project coordinators to schedule their travel to the project site. (Dkt. No. 40, ¶ 13.) Aside from emailing necessary immunization paperwork and reviewing their travel

arrangement, ATEs do not perform any substantive tasks for HCI prior to orientation or their first shift. (*Id.*) ATEs cannot perform the work for which they are hired until they are physically present at the "go-live" project site. (Vallone Dep. at 40 (Q: "And obviously you couldn't be guiding and training any nurses until you got to Rochester and into the Mayo clinic, right?" A: "Right."); Dkt. No. 40, ¶ 13.)

C.     **ATEs' Employment Ends When They Are "Cut" Or "Tapered" From The Project.**

Towards the end of the "go-live" project, HCI project managers determine how many ATEs are needed for each day remaining in the event. (Dkt. No. 40, ¶ 18.) This determination fluctuates based on the customer's progress with the technology, and typically fewer ATEs are needed as the project continues. (*Id.*) So, ATEs may be terminated (also referred to as "tapered" or "cut") early, or on some occasions, an ATE may be asked to stay at the project longer than anticipated. (*Id.*) Once an ATE is terminated, they complete their work shift and leave the project; they do not complete any additional tasks for the "go-live" project once leaving the project site (*Id.*; Ikogor Dep. 35 (being "cut" means "they don't need your services anymore")).

Once "cut" or "tapered," ATEs travel to a location of their personal choice or they may choose to stay in the area. Some travel home, others travel to another HCI worksite, and still others travel to worksites for other companies. (Dkt. No. 40, ¶ 19.) While some ATEs work on multiple projects close in time, most ATEs spend, at a minimum, several weeks or months between HCI projects. (*Id.*) ATEs are not employees of HCI during this time. (*Id.*) Many ATEs work for other technology companies, traveling from HCI projects

directly to other projects for other companies, or traveling directly from projects completed for other companies to HCI projects. (*Id.*)

## III. VALLONE AND IKOGOR WORKED ON THE MAYO CLINIC "GO-LIVE" EVENT IN ROCHESTER, MINNESOTA.

### A. Vallone Performed No Work While Commuting To Or From The Mayo Clinic.

Vallone lives in New York. (Vallone Dep. 10.) She has worked with medical recordkeeping technology since 2004. (*Id.* at 13-14.) Vallone testified that she is "always" a contractor with these companies. (*Id.* at 19.) "I've never been an employee."[3] (*Id.* at 22.)

In March 2018, HCI recruited Vallone to work the Mayo Clinic "go-live" event. (Vallone Dep. 33, Ex. 2.) The recruiter made clear that the project was "a 2-4 week assignment" with an arrival date of April 29, orientation sessions from April 30 through May 4, and a "go live" date of May 5. (*Id.*) Vallone accepted HCI's offer. (*Id.*; *see also* Exs. 3, 4.) Prior to traveling to the Mayo Clinic, Vallone performed no work at HCI's direction or for HCI's benefit—she completed onboarding paperwork, took a survey and a drug test, and submitted records to HCI, such as proof that she had received the immunizations required of hospital workers. (Vallone Dep. 34-37; *see also* Vallone Dep. Ex. 4 (offer letter outlining onboarding expectations).) She performed no substantive work for HCI prior to arriving at the Mayo Clinic. (*Id.* at 40.)

---

[3] Vallone claims not to understand the distinction between an independent contractor and an employee. (Vallone Dep. 22-23.) Nonetheless, in a separate lawsuit Vallone has commenced against a different company, Vallone contends the company misclassified her as an independent contractor. (Vallone Dep. Ex. 16 (Complaint filed in *Vallone, et al. v. Santa Rosa Consulting Inc.*, No. 19-cv-11779 (E.D. Mich. June 14, 2019)).)

Vallone flew from New York to Minneapolis on April 29, 2018 for approximately five hours. (Vallone Dep. 47, Ex. 6.) She departed New York at 11:55 a.m. EST, and landed in Minneapolis at approximately 3:40 p.m. CST. (*Id.* Ex. 6.) After she "stood and waited" at the airport (Vallone Dep. 50), HCI bussed Vallone to a primary meeting location, and from there, Vallone went to her own hotel room in Rochester. (*Id.* 44.)

That evening, at around 11:00 p.m., Vallone learned that HCI was cancelling the orientation session previously scheduled for the next day. (*Id.* Ex. 8.) So, Vallone spent the day resting. (Vallone Dep. 45 (Q: "So on the 30th of April, . . . you did not go to the hospital for any reason whatsoever to do any work?" A: "No.").) Like Vallone, the new start date for the ATEs was set for May 1, 2018.  As orientation was postponed, ATEs were free to do as they pleased on April 30, 2018, were not required to check-in or be available on April 30, 2018, and did not perform any work for HCI on April 30, 2018 nor were they required to be available to perform work for HCI on April 30, 2018. (*Id.*; Ikogor Dep. 79-80).

Vallone testified that her employment with HCI at the Mayo Clinic began when she arrived at orientation the next day, May 1, 2018, and her employment ended when she was "tapered" on May 16, 2018. (Vallone Dep. 22, 68; Ex. 11.) Vallone attended orientation May 1 through May 4 and worked the "go-live" event from May 5 through May 16. (*Id.* at 60-61.) During the "go-live," Vallone worked the night shift from 7:00 p.m. to 7:00 a.m. (*Id.*)

On May 17, the day after Vallone's employment ended, she flew from Rochester, Minnesota, departing at 2:40 p.m., to Rochester, New York, arriving at 9:54 p.m., a flight that took approximately six hours accounting for the time zone difference. (Vallone Dep.

69.) Vallone performed no work for HCI as she traveled home. (*Id.* (Q: "When you were on the flight in on the 29th and the flight out on the 17th, were you able to do whatever you wanted during your flight time?" A: "Yes.").) Indeed, in Vallone's declaration submitted in support of her motion for conditional certification, she makes no mention of performing any work for HCI prior to her arrival at the Mayo Clinic on May 1. (*See generally* Vallone Decl.) Nonetheless, Vallone is clear that she is seeking compensation for (1) her time spent traveling to and from Minnesota (during which she admits she was not employed by HCI, and performed no work for HCI), and (2) April 30, a day scheduled for orientation that was cancelled, the day prior to when she claims her employment began. (Vallone Dep. 89.)

Ikogor has also worked for "numerous technology companies" as an ATE. (Ikogor Decl. ¶ 4.) He has worked for these companies "all over the U.S.," despite living in Florida and occasionally staying with his sister, who lives in Georgia. (Ikogor Dep. 17-18.) He has worked for HCI on ten "go live" projects around the country since June 2017, three at the Mayo Clinic in Minnesota. (Ikogor Dep. Ex. 2 at 4-5.) He worked for multiple other companies during this period as well. (Ikogor Dep. 15-17.)

On March 12, 2018, Ikogor executed an offer letter to work as an ATE at the Mayo Clinic in April and May 2018 in Rochester, Minnesota. (*Id.* Ex. 7.) Like Vallone, he spent a short period, a "couple seconds," making sure HCI had all necessary paperwork, authorizations, and immunizations. (*Id.* at 74.) He did no substantive work for HCI until his arrival at the Mayo Clinic for orientation. (*Id.* at 53-54.)

Ikogor flew from Atlanta to Minneapolis on April 29, 2018 for approximately six hours. (Dkt. No. 39, Decl. of Claire Deason, Ex. 3.) He then rode an HCI-provided shuttle

from the airport to his hotel. (Ikogor Dep. 45.) He performed no work for HCI while traveling to the Mayo Clinic. (*Id.* at 53 (Q: "[Are there any] tasks that HCI asks you to do on the plane while you're traveling to a project?" A: "No, not that I know of.").) That evening, like Vallone, Ikogor received notice that the orientation scheduled for April 30 had been rescheduled. (*Id.* at 77, Ex. 8.) As a result, Ikogor, like Vallone, had "nothing to do" on April 30. (Ikogor Dep. 79.) He did no work for HCI prior to attending orientation on May 1. (*Id.* at 53, Ex 8.)

Following orientation, Ikogor worked the night shift during the "go-live" as a "Lead" on the project. (Ikogor Decl. ¶ 7.) HCI "cut" Ikogor from the Mayo Clinic project on May 15, and he flew out of the Minneapolis airport the following day, May 16, 2018. (Ikogor Dep. Ex. 2 at 5.) He did not fly home; from Minnesota, he flew to another HCI project at the Barnes Jewish Clinic in St. Louis, Missouri. (*Id.*) The flight took approximately an hour and thirty minutes. (Dkt. No. 39, Ex. 3.)

## STANDARD OF REVIEW

Only a genuine and material factual dispute may defeat a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). HCI bears the burden to demonstrate that "no genuine issue as to any material fact" exists. FED. R. CIV. P. 56. Conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence, does not create a "genuine issue" of "material fact." *E.g.*, *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 852 (8th Cir. 2012).

## ARGUMENT

The Court has ruled that it lacks personal jurisdiction over HCI as to claims with no

connection to Minnesota. (Dkt. 49 at 4-7.) Accordingly, Plaintiffs are now limited to seeking compensation for time spent traveling to and from Minnesota. Plaintiffs cannot meet their burden to prove they are entitled to compensation for this time.  First, Plaintiffs are only entitled to compensation for working time while they were HCI employees, and HCI did not employ Plaintiffs at the time that the travel occurred (before they arrived at a project location and after they departed). Second, Plaintiffs cannot meet their burden to show a triable issue regarding whether they were compensated improperly—the travel for which they seek compensation is a normal commute in the context of their work for HCI, and federal law does not require HCI to compensate its employees for time spent commuting. Even if the Court applies the regulation improperly advanced by Plaintiffs, their commutes are not compensable to the extent their travel to a project occurred outside of their "normal working hours" on that project. Likewise, Plaintiffs are not entitled to compensation for time they would have spent at an orientation HCI rescheduled (time they undisputedly performed no work for HCI), and Plaintiffs cannot meet their burden of proof on their alleged recordkeeping violations. Because the record contains no genuine issues fit for trial, the Court should grant HCI's Motion.

## I.      Plaintiffs Cannot Recover For Non-Minnesota Travel.

The Court should enter summary judgment in favor of HCI on all claims with no connection to Minnesota. In its February 5, 2020, Order on Plaintiffs' Motion for Conditional Certification, the Court held that it lacks personal jurisdiction over HCI as to any claims that do not have a connection to Minnesota. *Vallone*, Civ. No. 19-1532, Dkt. 49, slip op. at 7. To bring claims in this forum, the Court held that Plaintiffs must

demonstrate a connection between their claims and HCI's contact with Minnesota. Any broader collective would violate HCI's right to due process:

> Plaintiffs must establish that there is a connection between Minnesota and their individual claims against HCI. Here, that means that the Court has jurisdiction only over the claims of HCI workers who were assigned to the Mayo Clinic project or workers who are Minnesota residents. To the extent that Plaintiffs seek certification of a collective action that involves individuals other than Mayo Clinic workers or Minnesota residents, that request must be denied.

*Id*. Following the Court's Order, Plaintiffs have taken the position that nonresident putative plaintiffs can bring claims for *all* of their travel time to and from any state(s) so long as plaintiffs also had a claim for travel time to Minnesota because their distinct claims resulted from the same "corporate policy." (Dkt. 59 at 6-7.) This argument is a misplaced and confuses fundamental principles of due process and personal jurisdiction with the collective action certification standard. On February 20, the Court rejected Plaintiff's position: "[A]s the Court's previous ruling made clear, Defendant's contacts with this forum are limited to claims arising out of work in Minnesota and/or putative Plaintiffs who are Minnesota residents." (Dkt. 61 at 2.)

The Court's ruling is consistent with other courts who have limited FLSA actions to claims with a connection to the forum state. For example, in *Roy v. FedEx Ground Package System, Inc.*, 353 F. Supp. 3d 43 (2018), on a motion for collective certification, the court excluded all claims with no connection to the forum state. The court addressed the boundaries of specific personal jurisdiction, noting that the "defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being hauled into court there." *Id.* at 53-54 (citing *World-Wide Volkswagen Corp. v. Woodson*,

444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). "For this reason, 'specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Id.* (citing *Bristol-Myers*, 137 S.Ct. at 1780 (internal quotation marks omitted)); *see also Pettenato v. Beacon Health Options, Inc.*, No. 19CV1646JPOBCM, 2019 WL 5587335, at *9 (S.D.N.Y. Oct. 25, 2019) ("the out-of-state plaintiffs' claims 'do not arise' from Beacon Health's transaction of business in New York"); *Rafferty v. Denny's, Inc.*, No. 5:18-CV-2409, 2019 WL 2924998, at *4 (N.D. Ohio July 8, 2019) (limiting collective action to claims that "arise from the defendant's activities" in the forum state).

As the Court is aware, HCI does not dispute the Court's jurisdiction over it as to the claims of nonresident putative plaintiffs for travel time to and from projects in Minnesota. Those claims arise out of HCI's contact with Minnesota. On the other hand, claims by nonresident plaintiffs for travel time to and from other states have no relationship to HCI's contacts with Minnesota, and accordingly, the Court must exclude such claims from this lawsuit. For example, Named Plaintiff Ikogor worked for HCI in Minnesota and several other states—in this forum, Ikogor cannot pursue claims for travel to and from other states because those claims do not in any way "arise out of or relate to" HCI's contact with Minnesota. Ikogor's travel to Minnesota does not create a connection between his travel to other forums and HCI's contact with Minnesota. Put differently, travel to Minnesota does not "open the door" and allow Ikogor to bring claims in this forum that the Court would otherwise lack personal jurisdiction over HCI to hear. Plaintiffs have cited no authority to support their attempt to aggregate claims related and unrelated to this forum, and they

cannot evade the constitutional boundaries of due process and specific personal jurisdiction by styling their discrete claims—claims that arose at different times, in different manners, in different places—as a single claim, suit, or cause of action. Plaintiffs' attempt to rely on a single "corporate policy" is also misplaced. The question is not whether HCI subjected Plaintiffs to a single policy such that the Court should hear their otherwise actionable claim in one lawsuit. The question is whether *this* Court has the power to hear all of those disputes in the first instance. This Court has personal jurisdiction over HCI only as to Ikogor's claim relating to his Minnesota travel,[4] as that is the only claim that arose out of HCI's contacts with Minnesota. The same is true for all nonresident putative plaintiffs. The Court should enter summary judgment on the claims of nonresident putative plaintiffs to the extent they seek compensation for time spent traveling outside of Minnesota.[5]

## II.    Plaintiffs Were Not Employees At The Time Travel Occurred.

Plaintiffs have no viable argument they were employed by HCI when they traveled to or from the "go-live" projects. The FLSA, MFLSA, and the New York State Minimum Wage Orders apply exclusively to employees. *See* 29 U.S.C. § 203(d); 12 N.Y. Comp. Codes R. & Regs. Pt. 142; Minn. Stat. § 177, et al.  An "employee" is "any individual

---

[4] All Ikogor would have had to do to submit his claims in a single case would have been to file in Florida where HCI is based and where he resides.

[5] Plaintiffs have tried to sidestep the Court's Order in this regard in other ways, including by filing the consent form of Shade Alabi. (Dkt. 54.) Alabi did not travel to Minnesota or work in Minnesota for HCI. She nonetheless filed her consent to join this action eight days after the Court limited this action to claims with a Minnesota connection. HCI raised this issue with Alabi's counsel, who repeatedly insisted without support that a good-faith basis existed for Alabi's claims.  HCI then moved to dismiss her from this lawsuit and for sanctions. (Dkt. 68.) On the day before HCI's deadline to file its motion papers, and in recognition that she had no viable claim from the start, Alabi withdrew from this action. (Dkt. 86.)

employed by an employer," and "employ" means "to suffer or permit to work." 29 U.S.C. § 203(e)(1)-(g); Minn. Stat. § 177.23, subd. 7 (defining an "employee" as "any individual employed by an employer", with certain, specified exclusions); 12 N.Y. Comp. Codes R. & Regs. Pt. 142-2.14 (defining "employee" as "any individual employed, suffered or permitted to work by an employer"). Aside from standard working time, Minnesota employees are only entitled to compensation for "time when the employee must be either on the premises of the employer or involved in the performance of duties in connection with his or her employment or must remain on the premises until work is prepared or available." Minn. R. 5200.0120, sub. 1. Likewise, New York law entitles employees to compensation (outside of standard working time) for "time spent in traveling to the extent that such traveling is part of the duties of the employee." 12 N.Y. Comp. Codes R. & Regs. § 142-3.1(b). Since Plaintiffs were not employed by HCI when they traveled to or from the "go-live" projects, and because it is undisputed that they performed none of their assigned duties for HCI while traveling, Plaintiffs cannot recover and their claims must be dismissed as a matter of law.

Plaintiffs' employment with HCI begins when they arrive at the project location and terminates or ends when their work on the project is complete. (Dkt. 40, ¶ 12.) It is undisputed that, before arriving at a "go-live" project location, Plaintiffs perform no work for HCI whatsoever. (*See* Vallone Dep. 66 (Q: "When you were on the flight in on the 29th and the flight out on the 17th, were you able to do whatever you wanted during your flight time?" A: "Yes."); Ikogor Dep. 53 (Q: "[Are there any] tasks that HCI asks you to do on the plane while you're traveling to a project?" A: "No, not that I know of.").) Nothing in

the record suggests that Plaintiffs performed any substantive work for HCI while traveling to a "go-live" project or before engaging in orientation at the "go-live" location. Plaintiffs' employment did not begin until they arrived at the "go-live" project specific orientation.

The same is true for their travel home. Neither Vallone nor Ikogor contend that they performed work for HCI on their return trips. Indeed, as it relates to the Mayo Clinic project in 2018, Vallone and Ikogor each flew out of Minnesota the day after they had been terminated from the project and HCI's employ; Vallone testified at her deposition that her employment ended the day before her flight. Ikogor testified similarly at his deposition— he was "cut" the day before his flight because HCI no longer needed his services. (Ikogor Dep. 35.) Since HCI did not "suffer or permit" Plaintiffs to work for it while they traveled (indeed, their employment had undisputedly ended by the time of their departing flights), they were not employees of HCI at the time of travel, and they are not entitled to compensation for their travel time. 29 U.S.C. § 203(e); *Batts v. Prof'l Bldg., Inc.*, 276 F. Supp. 356, 360 (S.D.W. Va. 1967) ("[E]ven under [the FLSA's] broad definition of employee[,] the courts have limited the scope of the covered activity to work which is undertaken with the employer's knowledge and consent, express or implied."). The Court should enter judgment as a matter of law for HCI on Plaintiffs' travel time claims under federal and state law.

## III.   Plaintiffs Are Not Entitled To Compensation For Time Spent Commuting.

Under the FLSA, "the employee has the burden of proving that the employee was not properly compensated for work performed." *See Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 686–87 (1946). Unless otherwise exempt, an employee is entitled to

overtime pay for compensable hours worked over 40 in one workweek under the FLSA and New York state law and compensable hours worked over 48 in one workweek under Minnesota state law.   *See* 29 U.S.C. § 207(a)(1); 12 N.Y. Comp. Codes R. & Regs. Pt. 142.2.2; Minn. Stat. § 177.25, subd. 1.[6]  To recover on a claim for alleged failure to pay minimum wage, the employee must establish whether the amount of compensation received results in a straight-time hourly rate that is less than the applicable federal or state minimum wage. *See* 29 C.F.R. § 778.109.[7]

Compensable time is time spent on a "principal activity" for the benefit of the employer, with the employer's actual or constructive knowledge. 29 C.F.R. §§ 785.7-.11; 12 N.Y. Comp. Codes R. & Regs. Pt. 142.2.1(b) (time spent traveling, to the extent such traveling is part of the duties of the employee, is compensable). Congress limited the types of compensable hours when it passed the Portal-to-Portal Act. 29 U.S.C. § 254(a).[8] Under the Act, employees are not entitled to wages for:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity; and
>
> (2) activities which are preliminary to or postliminary to said

---

[6] In this respect, the Minnesota Fair Labor Standards Act ("MFLSA") is less restrictive than its federal counterpart, the FLSA. Accordingly, this brief addresses the FLSA standard.

[7] Plaintiffs have the burden to establish a minimum wage violation. *See Anderson,* 328 U.S. at 686–87. Even if the Court considers the travel time to and/or from "go-live" projects, Plaintiffs fail to establish that they were not compensated at minimum wage for all hours "worked" within a workweek – even if we consider the travel time "hours worked." Plaintiffs' failure to provide any evidence or support for their minimum wage claims requires their claims to be dismissed, with prejudice.

[8] As Minnesota does not have a law stating how employers must pay hourly employees who travel overnight away from home, we look to the FLSA and the Department of Labor's corresponding regulations.

> principal activity or activities, which occur prior to the time on
> any particular workday at which such employee commences,
> or subsequent to the time on any particular workday at which
> he ceases, such principal activity or activities.

*See* 29 U.S.C. § 254; *Dalton v. Hennepin Home Health Care, Inc.*, 2016 U.S. LEXIS 108765 at *6 (D. Minn. Aug. 16, 2016) ("The FLSA generally exempts employers from compensating employees for time spent 'traveling to and from the actual place of performance of the principal activity or activities" of employment.") (citing 29 U.S.C. § 254(a)). "Principal activities" are those that are an "integral and indispensable part of the principal activities", specifically those that are "an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform those activities." *Integrity Staffing Sols. v. Busk*, 135 S. Ct. 513, 517 (2014); *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 590 (2d Cir. 2007). "Normal travel from home to work is not worktime." 29 C.F.R. § 785.35; *Manners v. State*, 183 Misc. 2d 382, 389, 703 N.Y.S.2d 375, 380 (Ct. Cl. 2000), aff'd, 285 A.D.2d 858, 727 N.Y.S.2d 547 (2001). "Travel that keeps an employee away from home overnight" is worktime but "as an enforcement policy, the [Department of Labor does] not consider as worktime that time spent in travel away from home outside of regular working hours as a passenger on an airplane, train, boat, bus, or automobile." *Id.* § 785.39.

### A.     Plaintiffs' Travel Was Non-Compensable Home To Work Travel.

The time spent by ATEs traveling to the "go-live" project site is not compensable because it is normal travel in the context of their work for HCI and other technology companies. Federal courts "interpret 'normal travel' as used in [this] regulation, to refer to

the time normally spent by a specific employee traveling to work. The term does not represent an objective standard of how far most workers commute or how far they may reasonably be expected to commute. Instead, it represents a subjective standard, defined by what is usual within the confines of a particular employment relationship." *Kavanagh v. Grand Union Company, Inc.*, 192 F.3d 269, 271-72 (2d Cir. 1999) (holding that travel time was "normal" (and therefore outside the scope of the FLSA), even though the plaintiff commuted five and one-half to nine and one-half hours a day depending on the location of the supermarkets to which he was dispatched).

Here, the "normal" travel from home to work consisted of travel via plane and car. Vallone testified that persons coordinated air travel and hotels for the Plaintiffs working on projects (Vallone Dep. 42). For these types of intensive, short-term projects, a flight to and from the project location, with hotel stay for the duration of the work, was "normal" (*see id.*). Plaintiffs' travel via plane and car was from home to work and back. This is "normal travel from home to work," and "is not worktime." 29 C.F.R. § 785.35.

The fact that travel kept Plaintiffs away from their home multiple days does not change that it was non-compensable "normal travel from home to work." *See* 29 C.F.R. § 785.35. "Home-to-work travel that is 'a contemplated, normal occurrence' of the employment is viewed as 'normal travel' under the regulation." *Kuebel v. Black & Decker (U.S.) Inc.*, 2009 U.S. Dist. LEXIS 43846, *26 (W.D.N.Y. May 18, 2009). In *Imada v. City of Hercules*, the Ninth Circuit explained that travel need not be frequent, in order to be "normal" or "ordinary." 138 F.3d 1294, 1297 (9th Cir. 1998) (police officer's travel to remote site for three-day training program was non-compensable home to work travel; it

was a "normal, contemplated and mandated incident of their employment" even though infrequent). Plaintiffs' respective commutes need not be a daily commute to qualify as non-compensable "home to work" travel.

To hold otherwise would effectively "produce perverse incentives for workers who travel to remote job sites" because, "if their travel time were compensable, plaintiffs would then be strongly motivated to return home each night." *Ricard v. KBK Servs.*, 2016 U.S. Dist. LEXIS 120483, *3, *16 (W.D. Wisc. Sept. 7, 2016). Plaintiffs "could add up to six hours to [his] compensable time each day, merely by returning home, rather than staying near the job site," and much of that additional time "would have to be paid at overtime rates." *Id.* This "proposed interpretation of the travel rules would strongly encourage workers to undertake a great deal of inefficient and potentially unsafe travel." *Id.*; *see also Little v. Tech. Specialty Products, LLC*, 940 F. Supp. 2d 460, 474 (E.D. Tex. 2013) (finding that even when oil rig worker, living in the North Texas area, was required to travel to various rig locations in Louisiana, Texas, Oklahoma, Colorado, and New Mexico, such commuting – even with considerable distance – occurred within the worker's normal commuting area and was not compensable under the FLSA).

Indeed, federal courts have regularly held that even lengthy and arduous home to work travel is non-compensable. Courts note, "Plaintiff chose where he lived and how to get to and from work." *Pittard v. Red River Oilfield Servs., LLC*, 2017 U.S. Dist. LEXIS 206956 (S.D. Tex. Dec. 15, 2017) (time plaintiff spent driving for hours from his home in South Texas to project sites in New Mexico and West Texas was "traveling from home to work" and not compensable); *Ricard*, 2016 U.S. Dist. LEXIS 120483 at *15 (plaintiffs'

time spent driving between 115 and 160 miles from home to worksites before start of work was commute time and not compensable); *Vega v. Gasper*, 36 F.3d 417, 424 (5th Cir. 1994) (overturning judgment for workers finding that four hour daily commute on company bus to and from work site was *not* compensable under the FLSA where workers did not perform work prior to or while riding the bus). "The fact that the travel time was so long does not make it compensable under the statute. . . The travel time was just an extended home-to-work-and-back commute." *Vega ex rel. Trevino v. Gasper*, 36 F.3d 417, 425 (5th Cir. 1994) (four hour commute was not compensable); *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274 (10th Cir. 2006) (three and a half hour commute was not compensable). The length of Plaintiffs' travel does not transform non-compensable home to work travel into compensable working time. 29 C.F.R. § 785.35. Plaintiffs are not entitled to wages for time spent commuting to or from the "go-live" location. The Court should grant HCI's Motion and enter summary judgment on Plaintiffs' claims.

## B.    Travel Away From Home Outside of "Normal Working Hours" Is Not Compensable.

Plaintiffs mistakenly rely on 29 C.F.R. § 785.39, which provides that travel away from home is compensable if the travel occurs during an employee's "normal working hours." As Plaintiffs were not employees at the time of travel, and their commutes are normal, noncompensable commutes, 29 C.F.R. § 785.39 is inapplicable. But even if the Court is inclined to apply this regulation, Plaintiffs' claims still fail as the regulation contemplates travel "away from home overnight" only during "normal working" hours:

> Travel that keeps an employee away from home overnight is travel away from home.  Travel away from home is clearly worktime when it cuts across

the employee's workday.  The employee is simply substituting travel for other duties.  The time is not only hours worked on regular working days during ***normal working hours*** but also during the corresponding hours on nonworking days.   Thus, if an employee regularly works from 9 a.m. to 5 p.m. from Monday through Friday the travel time during these hours is worktime on Saturday and Sunday as well as on the other days.  Regular meal period time is not counted.  As an enforcement policy the [U.S. Department of Labor] will not consider as worktime that time spent in travel away from home outside of ***regular working hours*** as a passenger on an airplane, train, boat, bus, or automobile.

*See* 29 C.F.R. § 785.39 (emphasis added).

Here, ATEs are assigned to a specific shift for the duration of each "go live" event, their "normal working hours," and HCI is entitled to summary judgment to the extent Plaintiffs cannot establish that their travel occurred during their "normal working hours" on any particular project. Vallone's own evidence establishes that she is not entitled to compensation for the time she spent traveling. During the "go-live" project for Mayo Clinic, Vallone testified that she worked the night shift from 7:00 p.m. to 7:00 a.m. CST (Vallone Dep. Ex. 10.) Vallone's travel did not occur during that timeframe. To travel to the "go-live" project, she departed New York at 10:55 a.m. CST, and landed in Minneapolis at approximately 3:40 p.m. CST. (*Id.* Ex. 6.) Her travel from the Mayo Clinic project occurred between 2:40 p.m. (CST) to 8:45 p.m. (CST), similarly occurring largely outside the timeframe of her "normal working hours." The approximately one hour and forty-five minutes that overlap with her "normal working hours" for the Mayo Clinic "go-live" project evidences the exceptional, individualized relief that Vallone claims in this litigation.  Even if we assume, *arguendo*, that Vallone's "regular working hours" during the Mayo Clinic "go-live" project were 7:00 p.m. to 7:00 a.m. (CST), the vast majority of

Vallone's travel did not cut across her "workday" and is not compensable.

Similarly, Ikogor's travel to and from the Mayo Clinic project in April-May 2018 occurred in part outside of his normal working hours and is not compensable. Ikogor worked the day shift on the project (6:30 a.m. to 6:30 p.m.) (Christensen Decl. Ex. C), and he traveled to the project during the day. However, Ikogor's departing flight took him to Chicago, Illinois. He landed in Chicago at 4:05 p.m. and boarded a connecting flight that occurred after his normal working hours. His connection departed Chicago at 7:15 p.m. (CST) and arrived in Rochester, NY at 9:54 p.m. (EST). (*Id.* Ex. H.) Because this flight occurred outside of Ikogor's normal working hours on the project, it is not compensable. As discussed above, Ikogor is limited to his claims for travel to and from Minnesota.

Even if the Court considers Ikogor's non-Minnesota travel, much of his travel to and from out-of-state "go-live" projects did not intersect or cut across Ikogor's scheduled hours for each particular project, rendering them not compensable as a matter of law. For example, Ikogor also worked at a "go live" event in Missouri in December 2017. (Ikogor Dep. Ex. 2 at 5.) He worked the night shift on the project, 7:00 p.m. to 7:00 a.m. (Christensen Decl. Ex. C at 8), but he traveled to the project during the day. He departed Atlanta, Georgia at 8:35 a.m. (EST) and arrived in St. Louis, MO at 9:25 a.m. (CST). (Christensen Decl. Ex. D.) He also departed the project during the day—his flight left St. Louis at 6:00 a.m. (CST) and arrived in Atlanta, GA at 8:38 a.m. (EST). (Christensen Decl. Ex. E.) Only one hour of Ikogor's total travel to this project cut across his normal working hours on the project. The same is true for a subsequent project Ikogor worked in Missouri in May 2018. (Ikogor Dep. Ex. 2 at 5-6.) He worked the night shift again. (Christensen

Decl., Ex. C at 10.) However, to travel to the project, he departed Minneapolis, Minnesota at 3:03 p.m. (CST) and arrived in St. Louis, MO at 4:26 p.m. (CST). (Christensen Decl. Ex. F.) Because this travel occurred outside of his normal working hours on the project, it is not compensable. The same is true for his departing travel. Ikogor left St. Louis at 5:30 p.m. (CST) and arrived in Atlanta, Georgia at 8:10 p.m. (EST). (Christensen Decl. Ex. G.) Only one hour and ten minutes of Ikogor's total travel to and from this project intersected with his normal working hours on the project. Even if the Court finds that Plaintiffs were employed at the time of their commutes and their commutes are compensable, their claims must fail to the extent his travel to a given project did not occur during his normal working hours on that project. Because this time is not compensable, even under the regulation advanced by Plaintiffs, Plaintiffs cannot establish that HCI failed to pay them either minimum wage or overtime, and hence their claims must be dismissed.

## IV. Plaintiffs Are Not Entitled To Compensation For The Postponed April 30, 2018 Orientation Event at Mayo Clinic

Plaintiffs' claim for compensation for a postponed orientation event at the Mayo Clinic "go-live" project fails because Plaintiffs were not engaged to wait, but were rather free to do as they pleased. The Supreme Court has recognized that on-call time is compensable only under limited circumstances. *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944); *Skidmore v. Swift & Co.*, 323 U.S. 134, 136 (1944).

In determining whether such time constitutes "hours worked," the Supreme Court in *Skidmore* drew the distinction as to whether "the employee was engaged to wait," which is compensable, or if he "waited to be engaged," which is not compensable. *Skidmore*, 323

U.S. at 137. The Department of Labor regulations generally provide that on-call time is compensable only where (a) the employee is required to remain on the premises or (b) the on-call time is "so circumscribed" that it effectively restricts the employee's ability to use the time for personal pursuits. 29 C.F.R. § 553.221(c). The general rule is that, "although *every* on-call policy creates some imposition on the life of the employee subject to the terms thereof, such time will nonetheless rarely be compensable." *Darrah v. Missouri Highway and Transp. Com'n,* 885 F. Supp. 1307, 1311 (W.D. Mo. 1995). "[T]hose cases which have departed from this general rule demonstrate the exceptional circumstances which must obtain for on-call time to be compensable under the FSLA." *Sletten v. First Care Med. Services*, CIV. 98-2446 (RLE), 2000 WL 1196199, at *14 (D. Minn. Mar. 20, 2000). Plaintiffs cannot establish "exceptional circumstances" necessary to warrant relief.

On April 29, 2018, Vallone flew from New York to Minneapolis. (Vallone Dep. 47, Ex. 6.) That evening, at around 11:00 p.m., Vallone learned that HCI was cancelling the Mayo Clinic training session previously scheduled for the next day. (*Id.* Ex. 8.) So, Vallone spent the day resting. (Vallone Dep. 45 (Q: "So on the 30th of April, . . . you did not go to the hospital for any reason whatsoever to do any work?" A: "No.").) Like Vallone, the new start date for the ATEs was changed from April 30, 2018 to May 1, 2018.

Similarly, Ikogor flew from Atlanta to Minneapolis on April 29, 2018. (Dkt. No. 39, Decl. of Claire Deason, Ex. 3.) That evening, like Vallone, Ikogor received notice that the orientation scheduled for April 30 had been rescheduled. (*Id.* at 77, Ex. 8.) As a result, Ikogor, like Vallone, had "nothing to do" and spent the day "hang[ing] around" and eating

at the hotel restaurant. (Ikogor Dep. 79.) Ikogor further testified that other ATEs simply decided to go home when they were notified that orientation was postponed one day. (*Id.* 81.)

Plaintiffs cannot establish any "exceptional circumstances" contemplated by the Department of Labor necessary to establish that the postponed orientation session resulted in Plaintiffs being engaged to wait. *See, e.g.*, *Reimer v. Champion Healthcare Corp.*, 258 F.3d 720, 726 (8th Cir. 2001) (holding that employees' off-premises, on-call hours were not spent predominately for the benefit of the employer where very few restrictions were placed on the employees during their on-call hours); *Sletten v. First Care Med. Services*, CIV. 98-2446 (RLE), 2000 WL 1196199, at *12 (D. Minn. Mar. 20, 2000) (*Dinges v. Sacred Heart St. Mary's Hospitals,* 164 F.3d 1056, 1059 (7th Cir.1999) (finding on-call time spent by EMTs living in rural area who were required to arrive at hospital within seven minutes of receiving page, and had less than a 50% chance of being called in any 14–16 hour shift, were not compensable); *Berry v. County of Sonoma,* 30 F.3d 1174 (9th Cir.1994) (coroners not entitled to compensation for on-call time despite the fact that they were on call 24 hours a day, were required to respond to pages within 15 minutes, and received three to six calls per day), *cert. denied*, 513 U.S. 1150 (1995); *Gilligan v. City of Emporia, Kansas,* 986 F.2d 410 (10th Cir.1993) (sewer department employees not entitled to compensation for on-call time, although required to wear a pager, participate in nothing that might prevent them from hearing the pager, avoid alcohol, respond within 30 to 60 minutes of a call, and further, were subject to discipline for failure to satisfy these requirements); *DePriest v. River W. LP*, 187 F. App'x 403, 405 (5th Cir. 2006) ("Under the

FSLA, an on-call employee is not entitled to 'have substantially the same flexibility or freedom as he would if not on call,' and is not entitled to payment for on-call time if he is able to use it effectively for personal purposes, such as eating, sleeping, watching television, or engaging in other recreational activity."); *Adair v. Charter County of Wayne*, 452 F.3d 482, 488-89 (6th Cir. 2006) (requirement that officers carry pagers and respond to pages, with the threat of discipline for failure to respond, did not create compensable on-call time).

Because Plaintiffs were not required to be "on-call", perform any work for HCI, and were free to use their time for personal purposes, Plaintiffs' claim for compensation for a postponed orientation event at the Mayo Clinic "go-live" project fails because Plaintiffs were not engaged to wait. The Court should grant HCI's Motion as to this claim as well.

## V.   Plaintiffs' Claim For Failure To Comply With Record Keeping Requirements Under Minnesota State Law Fails.

HCI is also entitled to summary judgment on Plaintiffs' Minnesota law recordkeeping claim. Minnesota Statute Section 177.30 requires employers to make and keep records that include "the hours worked each day and each workweek by the employee." Minn. Stat. § 177.30, subd. 3. "By definition 'hours worked each day' includes beginning and ending time of work each day, which shall include a.m. and p.m. designations, and such designations shall be included in the employer's records." Minn. Admin. R. 5200.0100. "[A]n employee may bring a private suit for the violation of *any* section of the MFLSA, including a failure to maintain records." *See Milner v. Farmers Ins. Exch.,* 748 N.W.2d 608, 618–19 (Minn. 2008) (citing Minn. Stat. § 177.27,

subd. 8). Plaintiffs' claim is based exclusively on their allegation that HCI failed to pay for time spent traveling to and from the "go-live" projects.  Because Plaintiffs were not entitled to pay for time spent traveling to the "go-live" projects, Plaintiffs' claim for failure to comply with recordkeeping requirements fail.

## VI.   Plaintiffs' Claim For Failure To Comply With Record Keeping Requirements Under New York State Law Fails.

HCI is also entitled to summary judgment on Plaintiffs' New York law recordkeeping claim. New York Labor Law § 195 requires employers to make and keep records that include "a statement of every payment of wages . . . [including] the dates of work covered by that payment of wages, … number of regular hours worked, and the number of overtime hours worked." N.Y. Lab. Law § 195(3)-(4). Plaintiffs' claim is based exclusively on their allegation that HCI failed to pay for time spent traveling to and from the "go-live" projects.  Because Plaintiffs were not entitled to pay for time spent traveling to the "go-live" projects, Plaintiffs' claim for failure to comply with recordkeeping requirements fail.

## CONCLUSION

The Court should enter summary judgment in favor of HCI—Plaintiffs are not employed by HCI at the time of their travel, and hence they cannot recover compensation for time spent traveling under federal or state law. Plaintiffs are likewise not entitled to compensation for the period of time HCI had scheduled an orientation (that it then rescheduled) because Plaintiffs admittedly performed no work for HCI during this time. If the Court is not inclined to dismiss this lawsuit in its entirety despite these defects, the

Court must limit this action to its proper scope—claims for time spent traveling that occurred during employees' normal working hours and, as to nonresident plaintiffs, travel during normal working hours to or from Minnesota. The Court should grant HCI's Motion.

Date: April 14, 2020

*s/Corey J. Christensen*

Jacqueline E. Kalk (#0388459)
jkalk@littler.com
Claire B. Deason (#0390570)
cdeason@littler.com
Corey J. Christensen (#0398314)
cchristensen@littler.com
Grant D. Goerke (#0365226)
ggoerke@littler.com
**LITTLER MENDELSON, P.C.**
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402.2136
Telephone: 612.630.1000

**ATTORNEYS FOR DEFENDANT THE CJS SOLUTIONS GROUP, LLC, D/B/A THE HCI GROUP**